## THOMPSON PEGG, and others, *vs.* RICHARD C. WARFORD.

A deed executed by a legatee or devisee, conveying his interest *for the purpose* of restoring his competency as a witness for the will, cannot be assumed by this court not to have been executed in *good faith*, and whether it was or not, the grantor cannot assail it upon any such ground, and he is thereby made a competent witness.

The practice of restoring the competency of witnesses at the trial, by executing releases or deeds, has so long prevailed, and been sanctioned by the courts of this State, that it cannot now be disturbed.

An objection to a witness before he is examined, must be to his *competency,* and not to the *admissibility* of his *testimony.*

The legal presumption is in favor of the competency of every witness, and no objection to his competency should be entertained, unless the party making it, discloses at the time the ground on which it is based; a mere general, indefinite objection will not avail.

A party offering a witness is not bound to state any special purpose for which he is offered, or to show, until the contrary is at least *prima facie* established, that he is a competent and legal witness.

All legal and pertinent evidence, admissible for any purpose, may be offered *generally.*

If evidence offered for a particular purpose be inadmissible for that purpose, it is properly rejected, though admissible generally, or for some other object.

Where several purposes, for which testimony is offered, are specified, and it could have been offered for *no others,* the offer is virtually a *general one,* though, in point of fact, the evidence may not be legally applicable to *all* the specified purposes, and if admissible for *any one* of them, it is properly admitted.

To prevent the jury from applying the evidence to a purpose to which it does not relate, it is the duty of the party objecting, to point out specifically the purpose to which it has no legal application and ask of the court its exclusion for such purpose.

A general objection to testimony which is *per se* applicable to the case for *any purpose*, will not be sustained, though it be inapplicable to others.

Where evidence is offered generally, it must be assumed that it will be applied by the jury to the purposes to which it is legally applicable, and if a party wishes to guard against its misapplication, he must ask the court to point out the branch of the case to which it is not to be applied.

Where testimony is *per se* admissible, its sufficiency to establish the *whole case* is a question to be determined by the jury, upon a prayer properly framed and presented after the evidence is closed.

Proof by one witness that a party was worth $30,000, and owned land in other places, is admissible as a step towards establishing the fact that he was worth $100,000, which was the issue to be proved.

Such testimony, though referring to the party's condition in 1850 or 1852, is admissible to prove the truthfulness and honesty of a statement that he was worth $100,000, made in 1847, the issue being not so much the *precise time when* he was worth that sum, as the *truthfulness* of the *statement* on the subject, and the testimony being also *rebutting evidence*, and connected with other facts and circumstances.

Where the rulings of the court below, in regard to the validity of a subsequent will *revoking* a prior one, are *sustained* by this court, and the subsequent will is established, all questions presented in the record as to the prior will, are wholly unimportant, and will not be considered or decided.

APPEAL from the Circuit Court for Baltimore county.

This was a case of issues from the Orphans court, to try the validity of two wills executed by Rachel Colvin, deceased, the one on the 30th of October 1845, and the other on the 6th of April, 1848. These issues were granted by the Orphans court for Baltimore city, and sent to the Superior court of said city for trial, but were afterwards, upon suggestion of the appellants, removed to the Circuit court for Baltimore county. They were in substance as follows:

1st. Whether the paper of the 6th of April 1848, was executed by Rachel Colvin as her last will and testament, when she was of sound and disposing mind, and capable of executing a valid deed or contract?

2nd. Whether it was executed by her under the influence of suggestions and importunities of some person or persons, when her mind, from its diseased or enfeebled state, was unable to resist the same?

3rd. Whether the paper of the 30th of October 1845, was

duly executed and published as the last will and testament of said Rachel Colvin?

4th. Whether the paper of the 30th of October 1845, was revoked by the paper purporting to be the will of said Rachel, dated the 6th of April 1848?

5th. Whether the paper of the 30th of October 1845, was revoked by the said Rachel in any other manner than by the will of the 6th of April 1848?

6th. Whether the said Rachel was prevented, by the fraudulent concealment of the will of the 30th of October 1845, by any person or persons, from revoking the same by burning, cancelling, tearing or obliterating the same, or otherwise?

7th. Whether said Rachel was of sound and disposing mind and memory, and capable of executing a valid deed or contract at the time of the execution of the paper of the 30th of October 1845?

8th. Whether she was prevented, by the fraud or false representations, or undue influence of any person or persons, from revoking the said paper of the 30th of October 1845, by cancelling, tearing, burning or obliterating the same, or otherwise?

At the trial of these issues, the appellants, who were the caveatees and the alleged heirs at law and next of kin of the deceased, were the plaintiffs, and the appellee, who was the executor and principal legatee and devisee under the will of 1848, was the defendant.

*1st Exception.* The caveatee, to support the issue on his part, offered to swear Rachel Jane Warford, who was a legatee or devisee in the wills of 1845 and 1848, and the caveators having objected to her competency on the ground of interest, the caveatee, to show her competency, produced and read a duly certified copy from the records of the Superior court for Baltimore city, of a deed dated the 2nd of February 1855, from the witness to one Hamilton Warford, of Delaware county, in the State of Ohio, by which the witness conveyed to the said Hamilton, her brother, in consideration of natural love and affection, all her interest "under either of the wills"

of the said Rachel Colvin. He also produced and read a deed duly signed, sealed and delivered, from the witness to Frederick W. Brune, dated the 5th of February 1855, which, after reciting that whereas doubts had been expressed as to the efficacy of the preceding deed to Hamilton Warford, to pass all the interest of the grantor under *both wills*, and that whereas the grantor is desirous to divest herself of all and every interest remaining in or hereafter to accrue to her under both said wills, and each and either of them, "so as to render her a competent witness in relation to both said instruments," proceeds to convey to the grantee, in consideration of the premises and the sum of five dollars, current money, all the grantor's interest under said wills, and each and either of them, subject to the legal effect of said deed to Hamilton Warford.

The caveatee further proved by a witness, that he knew Hamilton Warford, who was a brother of Rachel Jane Warford, and of the caveatee, and lives in Ohio, and had seen him in Baltimore in 1853. The delivery and acceptance of the deed to Brune was admitted, but there was no proof given touching the knowledge or acceptance of the deed to Hamilton Warford by him, other than what is above recited. The caveators still insisting upon their objection, the court (Constable, J.,) overruled the same, and allowed the witness to be sworn. To this ruling the caveators excepted.

*2nd Exception.* The caveatee, upon the cross-examination of St. George W. Teackle, a witness produced by the caveators, proved that he (witness) endeavored to get the testatrix, Rachel Colvin, to insert in the will of 1845 the name of Mrs. Mary Ann Ellicott, as a devisee, but the said testatrix refused, upon the ground that Mrs. Ellicott was the only child of a rich father. The caveatee also proved by this witness and others, that at other times the said Rachel gave as a reason why she had not made provision for Mrs. Ellicott in her wills, that Mrs. Ellicott would be sufficiently provided for by her father, who was a rich man.

The caveators then proved by Mrs. Ellicott, a competent

74    v.7

witness, that in the year 1847, and in the fall of that year, the defendant, Colvin Warford, called upon her, and in the course of conversation during his visit, asked her if she knew how much her father was worth? to which she replied, "I do not." That Colvin Warford then said he had been to New Jersey, and would tell her how much he was worth, and that he was worth $100,000. The caveators then proved by the same witness, that about three or four weeks after this interview, witness went to see Miss Colvin, and Miss Colvin said, "I wanted to see you, to tell you I had made a will, leaving you a legacy, but Colvin says your father is worth $100,000, and you will have more than the others, and I must not give you any thing."

The caveatee then offered to examine Mr. Shrope as a witness, and having called him to the stand, he was objected to by the caveators' counsel, and the counsel for the caveatee being asked what they offered to prove by said witness, said, that they offered said witness for the purpose of contradicting Mrs. Ellicott, or impeaching her, by showing that she was mistaken as to the time of said conversation, if any was had, or that the statement of said Warford in said conversation, if it was had, was true. The caveatee then proved by said Shrope that he was one of the assessors of one of the townships of Hunterdon county, New Jersey, where Elisha Warford, the father of Mrs. Ellicott, resided; that he had been assessor of taxes for nine years, once in 1840 to 1846, and was again appointed in 1850, and has continued to act as assessor from that period until the present time. That in 1852, Colvin Warford called upon him to ascertain what was the amount and value of Elisha Warford's estate, that Elisha Warford was going security upon a bond in Maryland; that witness showed to Colvin Warford the assessment of Elisha Warford's estate, which was $10,000 worth of real estate, and that he owned lands in other places; that his personal estate was valued at $10,500, clear of debts due by him; this amount being handed in by Elisha Warford, and witness concurring with him, he was accordingly assessed therewith; that

he was assessed with debts due to him on bonds, mortgages and notes to the amount of $10,000, and that his name or bond would be good in that county for $30,000; that defendant never called upon witness at any other time than that above mentioned, for the purpose of ascertaining the amount of Elisha Warford's estate, nor did he at any other time give to Colvin Warford any other statement than that above mentioned.

The caveatee also proved, that when Benjamin H. Ellicott was appointed, by the chancellor, committee of the estate of said Rachel Colvin, he offered his father-in-law, the said Elisha Warford, as his surety, and on that occasion the said Elisha Warford, who then lived and still lives in New Jersey, for the purpose of satisfying the chancellor of the sufficiency of such security, filed his affidavit in the chancery court, stating that he was worth, at least, $60,000, which affidavit, with certificates attached, as to the value and assessment of his property, are inserted in the record.

To the admissibility of all which testimony of said Shrope, for the purpose for which it was offered, the counsel for the caveators objected, but the court overruled their objection, and permitted the evidence to go to the jury. To this ruling the caveators excepted.

*3rd Exception.* The caveatee proved the execution and publication of the two wills of October 1845, and April 1848. (These wills make different dispositions of the large estate of the testatrix, and the latter contains a clause *expressly revoking all former wills*.) The caveators then proved, by various witnesses, facts and circumstances tending to show that Rachel Colvin was not of sound and disposing mind, and capable of executing a valid deed or contract at the periods of the execution and publication of these papers. The caveatee also proved by like competent witnesses, a variety of facts and circumstances tending to show the capacity of the testatrix to make these wills at their respective dates.

The caveators then proved by Mr. Teackle, that for a series of years, beginning in 1843, and ending in 1849, he had been

the legal adviser of Rachel Colvin, and, as such, prepared for her, under her instructions, a will, which was duly executed by her in 1847, but at what period in that year witness cannot say, except that it was in or after the spring of that year, and that in the opinion of witness, derived from the relation in which he stood towards her, and from various interviews and conversations had with her, she was, at the time of executing the same, of sound and disposing mind, and capable of executing a valid deed or contract; that the name of Richard C. Warford, the caveatee, was wholly omitted in this will of 1847, and the name of Mrs. Ellicott inserted at the request of witness, as devisee of certain property; that witness was the executor thereof, and he believes it contained a clause revoking all former wills, from his habit of inserting such clauses in his preparation of wills.

The caveators then further proved by competent testimony, facts and circumstances tending to show that the will of 1847 was destroyed by the testatrix while her mind was sound, and likewise tending to prove that the will of October 1845 was not in her possession, or in the hands of any person authorized by her to retain the same, at the time of the destruction of the will of 1847; and further proved by competent testimony, facts and circumstances tending to show that she, at the time of the preparation and execution of the will of 1847, and also at the time of its destruction by her, if she did destroy the same, did not know that the will of October 1845 was in existence or in her possession. The caveatee thereupon offered evidence of facts and circumstances of a contrary tendency.

The caveators further proved by competent testimony, facts and circumstances tending to show that the caveatee, during the life of the testatrix, retained from her possession the will of October 1845, and concealed the same from her knowledge, with intent thereby to prevent its cancellation by her, and with a view and under the design, after her death, to set up said will for probate as a valid will, should his interest require it. The caveatee likewise offered testimony of a contrary tendency.

Pegg, *et al.*, *vs.* Warford.

Upon this proof the caveators offered sixteen prayers, eleven of which were granted, with the consent of the counsel for the caveatee.   Of these prayers thus granted, the following is the only one material to be stated.

"6th. If the jury find from the evidence, that Rachel Colvin, in excluding Mrs. Ellicott from the will of 1848, was influenced by the representation of Richard C. Warford, that her father, Elisha Warford, was worth one hundred thousand dollars, and shall further find that such representation was untrue, and that the will of 1848 was the result of such representation, then the verdict on the 2nd issue must be for the caveators."

The other prayers were in substance as follows:

1st. If the jury find that Rachel Colvin duly executed and published a will in 1847, when she was of sound and disposing mind, and capable of executing a valid deed or contract, differing materially from the will of October 1845, and containing likewise a clause of revocation, the subsequent cancellation or destruction by her, or by her direction, of the will of 1847, (if the jury shall find such destruction or cancellation,) will not have the effect in law to revive the will of October 1845, as her will.

2nd. If the jury find the facts stated in the preceding prayer other than that the will of 1847 contained a clause of revocation, still, if they find that it disposed of the estate of the deceased, in a mode materially differing from the will of October 1845, still the cancellation or destruction by her, or by her direction, of the will of 1847, if the jury find such cancellation or destruction, will not in law revive as her will the will of October 1845.

8th. If the jury find that Rachel Colvin duly executed and published the will of October 1845, and afterwards, in 1847, when she was of sound and disposing mind, and capable of executing a valid deed or contract, duly executed and published another will, purporting to dispose of all her property, and differing materially in its dispositions thereof from the will of 1845, and containing a clause revoking all former

wills, then such execution and publication of the will of 1847 revoked the will of 1845.

10th. If the jury find that Richard C. Warford, during the lifetime of Rachel Colvin, retained from her possession the will of 1845, and concealed the same from her knowledge, with intent thereby to prevent its cancellation by her, and with a view and under the design, after her death, to set up the same for probate as a valid will, should his interest require it, then their verdict must be for the caveators on the 6th and 8th issues.

15th. If the jury find that the will of 1845 was not in the possession of Rachel Colvin, or in the hands of any person authorized by her to retain the same for her at the time of the destruction or cancellation of the will of 1847, (if the jury shall find from the evidence that said last mentioned will was cancelled or destroyed by said Rachel Colvin while her mind was sound,) then the said cancellation of the will of 1847 does not revive the will of 1845.

These five last prayers the court rejected, and to this ruling the caveators excepted.

Five prayers were also offered on the part of the caveatee, and granted by consent of the counsel for the caveators, which need not be stated. The verdict was in favor of the caveatee upon all the issues, and the caveators appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON, J.

Henry Winter Davis, Grafton L. Dulany and John Johnson for the appellants.

1st. The first exception relates to the competency of Rachel Jane Warford as a witness for the caveatee. She was a legatee under the will of 1845 and a devisee under that of 1848. She comes into court and during the trial executes two deeds to restore her competency. Both were executed during the trial and will be regarded as part of the same transaction. The second deed refers to the first and states

upon its face that it was executed for the purpose of making the grantor a *competent witness.* Now it is clear that if the grantees in these deeds had brought suit to recover the legacies conveyed by them the grantor would not be a competent witness to sustain *that suit;* for that would be directly in the teeth of the decision in the case of *Crawford vs. Brooke,* 4 *Gill,* 213. The question is not whether the deed is good *inter partes,* but whether it is good as *against strangers.* The court in that case say the deed was not good as against strangers and that is *the case here*; for the attempt is here made to use it against, and to the prejudice of, *strangers.* As to strangers the court in that case have said that a deed executed for the purpose for which these were executed is *mala fide.* The practice of executing these releases at the *trial table* ought not to be encouraged and should not be carried beyond the decided cases. If Mrs. Ellicott is to be regarded with distrust as a witness because she was a disappointed legatee, how much more liable to distrust is the testimony of a witness who has released her whole interest under these wills for the *sole purpose* of rendering her a competent witness? Such an assignment is not a valid mode of restoring competency, but tends directly to encourage fraud and perjury by *creating* testimony to *create* the title to the very thing pretended to be transferred, which but for such testimony would have no existence.

2nd. The *second exception* relates to the admissibility of the testimony of Shrope for the purposes for which it was offered. When Shrope was called as a witness and was objected to, and the counsel for the caveatee were requested to state for what purpose they offered him, they said that they offered him for the purpose of contradicting Mrs. Ellicott, *or* impeaching her by showing that she was mistaken as to the time of said conversation if any was had, *or* that the statement of Warford in said conversation, if it was had, *was true.* Now these *purposes* being legitimate we could make no further objection until the testimony was in. When the testimony was given we then objected that it did not come up to

the purpose for which it was offered, and insisted that it was the duty of the court below to have ruled it out. Now we say:

1st. That this testimony was inadmissible and utterly incompetent to sustain *any one* of the purposes for which it was offered. A witness can be *impeached* in one of three ways only:—1st, by proving by a competent witness the opposite of the facts testified to by the witness sought to be impeached; 2nd, by showing that he has made contradictory statements in regard to the matter about which he testifies; and 3rd, by proof of general bad character for truth and veracity. 1 *Greenlf. on Ev.*, sec. 461. 3 *Md. Rep.*, 425, *Steuart vs. Williams.* Now this testimony does not impeach Mrs. Ellicott, by showing that she was mistaken as to the time of the conversation, and that this conversation occurred after 1852; for in 1851 Miss Colvin was a *declared lunatic,* and it was therefore impossible for Mrs. Ellicott to have held a conversation with her *after* 1852. As to this proposition therefore it is impossible for the human mind to doubt. There is again no clashing or inconsistency between the testimony of Shrope and that of Mrs. Ellicott. The fact that Colvin Warford went to New Jersey in 1852, does not prove that he did *not go* there in 1847, and has no tendency to prove that what Mrs. Ellicott testified to in regard to the conversation in 1847 was *not true.* There is therefore no process of ratiocination by which the testimony of Shrope can be regarded as impeaching that of Mrs. Ellicott, and yet the court below said it was testimony, and it went before the jury with the impress of judicial sanction upon it, and that too under *the offer* to *impeach* Mrs. Ellicott.

Nor does this testimony show that the statement of Warford in regard to the wealth of Elisha Warford *was true.* It proves only that Elisha Warford was in 1852 worth $30,000, and we are asked to infer from *this proof* that he was worth $100,000 in 1847. Upon this part of the argument the case of *Keedy vs. Newcomer,* 1 *Md. Rep.*, 241, is *conclusive.* It was held in that case that a *fi. fa.* returned "*made*" in one year, was no evidence to show that the party had property

out of which another *fi. fa.* issued the year previously could have been satisfied. The court there say: "It might very well be that a person should have property in March 1840 sufficient to satisfy a writ, and yet wholly without any in March 1839. The vicissitudes of life, and especially of that of men extensively engaged in business, make such testimony very unsafe *data* on which to predicate the conclusion sought to be arrived at in this case. The period is entirely too remote and we think therefore the court did right in rejecting it." How much stronger is the argument in this case that proof of a man's condition in 1852 is no evidence of what he was worth in 1847, *five* years previously? That proof of this character, so light and inconclusive as to afford unsafe *data* to warrant the conclusion sought to be arrived at, ought to be rejected, see also 5 *Md. Rep.*, 434, *Stewart vs. Spedden.* 4 *Do.*, 244, *Balto. & Susq. Railroad Co. vs. Woodruff.* 3 *G. & J.*, 435, *Sothoron vs. Weems.* 8 *Gill*, 18, *Maslin vs. Thomas.* 4 *Md. Rep.*, 509, *Marshall vs. Haney.* Mrs. Ellicott's *silence* when Miss Colvin told her what Warford had said in relation to her father's wealth, is in favor of the witness rather than against her; for she had said she did not know what her father *was worth*, and therefore like a truthful woman abstained from contradicting the statement of Warford when repeated to her by Miss Colvin.

But it is said on the other side that we must prove that the statement was *untrue*, and that this is a vital part of our case, because the jury found that it *was true*. This argument is *illogical*, because the jury were further to find under the prayer that the conversation was had in 1847 and influenced the will of 1848, and therefore they may have believed that the statement was untrue and yet have believed it did not influence the will of 1848. The court will not look to what effect the testimony may have had on the jury. If it is illegal it ought not to be admitted. 2 *Wash. (Va.) Rep.*, 359, *Lee vs. Tapscott.* 1 *Munford*, 291, *Brown vs. May.* 13 *Johns.*, 350, *Penfield vs. Carpenter.*

2nd. But conceding the evidence of Shrope was admissible

75 v. 7

for one or two of the three purposes for which it was offered and admitted by the court, we still ask for a reversal of the judgment, if for the *remaining purpose* for which it was offered and let in the proof was not admissible.   The purposes were stated in the alternative, and therefore unless the appellee was entitled to the benefit of the proof in support of each and every alternative, he has by the judgment of the court below obtained an advantage to which he is not entitled.   We say that unless it was admissible to establish *each one and all of the purposes* for which it was offered the testimony should have been excluded.   3 *G. & J.*, 435, *Sothoron vs. Weems.* In the case of *Nailor vs. Bowie,* 3 *Md. Rep.*, 251, if evidence had been admitted for the purpose of proving protest of *both notes,* and it was inadmissible for the purpose of proving protest *of one* of them, the court would have reversed the decision below, as they did upon the prayer `which assumed that the plaintiff was entitled to recover upon *both notes,* when the evidence as to each, if it had not been rejected, was insufficient to maintain the action.   Upon this point see, also, 4 *Md. Rep.*, 296, *Greenway vs. Turner.*   3 *Do.*, 67, *Stewart vs. Redditt.*   6 *Do.*, 525, *Warner vs. Hardy.*   3 *Gill,* 198, *Budd vs. Brooke.*   1 *Do.*, 129, *Whiteford vs. Burcknyer & Adams.*   4 *Md. Rep.*, 499, *Marshall vs. Haney.*   5 *G. & J.*, 159, *Md. Ins. Co. vs. Bathurst.*

3rd.  The *third exception* relates to the refusal of the court to grant the 1st, 2nd, 8th, 10th and 15th prayers of the caveators, and involves the law of the revocation and revival of wills.   The principle of the first prayer is, that the revocation of a subsequent revoking will does not, as a mere matter of law, without more, *revive* the former will, but that the first will can be revived only by *republication,* or if that be not requisite then it can be revived only by showing the revoking will to have been revoked *with intent* to *revive* the former.   We maintain that there is no adjudication to be found where an antecedent will, not in the possession of the testator, and not known by the testator to exist, has been *revived* by the *destruction* of the subsequent revoking will.   In all cases where

the prior will is held to be revived, it has been in the custody and possession of the testator at the time of his death.   Here the testatrix did not know of the existence of the will of 1845 at the time she destroyed the revoking will of 1847, and the prayers so put the case to the jury.   On this point the counsel cited 35 *Eng. C. L. Rep.*, 299, *Reed vs. Harris.*   2 *Conn.*, 67, *Witter vs. Mott.*   3 *Do.*, 576, *James vs. Marvin.*   *Burr.*, 2512, *Goodright vs. Glazier.*   1 *How., Miss. Rep.*, 336, *Bohanon vs. Walcot.*   7 *Johns. Ch. Rep.*, 258, *Walton vs. Walton.*   *Cowp.*, 87, *Harwood vs. Goodright.*   1 *Phill.*, 375, *Moore vs. De La Torre.*   3 *Curteis*, 774, *James vs. Cohen.* 1 *Hagg.*, 325, *Kirkcudbright vs. Kirkcudbright.*   2 *Add.*, 116, *Usticke vs. Bawden.*   2 *Am. Lead. Cases*, 643, 661.   2 *Dallas*, 266, *Boudinot vs. Bradford.*

The second prayer is the same as the first, omitting the finding of a clause of revocation in the will of 1847, and resting therefore on the implied revocation resulting from diversity of disposition.

The eighth prayer is, that the execution and publication of the will of 1847, with its clause of revocation, did operate a revocation of the will of 1845.   It rests on the words of the statute of 1798, ch. 101, that such shall be the effect of a subsequent will duly executed, declaring the revocation of a former will shall have that effect.

The tenth and fifteenth prayers relate to the effect of the fraudulent concealment of the will of 1845.   They go on the principle that the facts stated in them involve a fraudulent prevention of the revocation of the will of 1845, and the three last issues put that fact only to the jury.   If they find that fact they should find the issues affirmatively.   The effect of the finding is for the orphans court to pass upon when the whole record and evidence on other points, together with the facts found by the jury, shall be before them.   8 *Watts & Sergt.*, 275, *Jones vs. Murphy.*

We further insist that all the issues relating to both wills form but one record.   That a finding of part will be no response to the inquiry of the orphans court, and the omission

of any makes the whole finding of the others void. That for the same reason, if the finding on any issue be now reversed for error, the finding on all must be set aside and the whole be again submitted to the jury; for the court cannot know what effect a new or different direction to the jury on any point might have on their minds on the whole case. This court cannot know on what facts the orphans court may be called to pass on, and consequently this court cannot know but that the will of 1848 may be found not the will of Rachel Colvin and be refused probate by the orphans court, even though these findings be affirmed; and consequently the question may still arise as to the validity of the will of 1845. The instructions therefore touching that will of 1845 are fit subjects of argument on this appeal, and a reversal on any one of them must produce a general reversal of the finding of the jury, and consequently a new trial of the whole matter. 7 *Gill*, 10, 33, *Brooke vs. Townshend.* If this were not so the result will be that a part of the issues awarded may be found and certified, and a part remain subject to appeal, be reversed and tried, and retried, till by a succession of juries verdicts may be rendered of the most discordant character on the same evidence on each of the various issues.

*William Schley* and *Reverdy Johnson* for the appellee:

1st. As to the question arising under the *first exception*, we contend that the witness, Rachel Jane Warford, properly transferred her interest in the result of the suit, and was thereby made a competent witness. Such is the every day practice, and it was her duty to do it, if she had valuable information to impart, and was willing to impart it. 7 *G. & J.*, 311, *Deakins vs. Hollis*, But it is objected that under the act of 1829, ch. 51, no assignment can be made so as to enable the party *to sue* in his own name, when the assignment is made for the purpose of making the *assignor a witness*, and the case of *Crawford vs. Brooke* is cited to sustain this position. But in that case the court say, that the fact that the *witness* was an *assignor*, would make no *difference*, and would not render

him incompetent, but the point there decided was, that under the pleadings in *that case* the evidence destroyed the *plaintiff's right of action*, not that the witness was incompetent. The court refused to permit a question to be asked which went to the plaintiff's right of action. That case turns wholly upon the construction of the act of 1829, ch. 51. But here the court cannot, in this case, inquire into the *bona fides* of these deeds. The grantor is *estopped from denying that they are valid*, and she is therefore divested of all interest in the result of the suit. The *first* deed being on record, the delivery was complete. The recording is, at least, sufficient to warrant the presumption of delivery, and a *copy* from the office is sufficient. 3 *Md. Rep.*, 79, *Stewart vs. Redditt.* 1 *H. & G.*, 175, *Betts vs. Union Bank*.

2nd. On looking to the *second exception*, it will be seen that prior to the evidence of Mrs. Ellicott, stated in that exception, testimony had been given, without objection, by Mr. Teackle, that he had endeavored to get the testatrix to insert in the will of 1845 the name of Mrs. Ellicott, as a devisee, but that the testatrix refused, upon the ground that Mrs. Ellicott was the only child of a rich father. And testimony had been given, without objection, by Teackle and other witnesses, that the testatrix at other times gave as a reason why she had not made provision for Mrs. Ellicott in her wills, that she would be sufficiently provided for by her father, who was a rich man. Then the evidence of Mrs. Ellicott was introduced by the caveators, that in the fall of 1847, the appellee called upon her, and in the course of conversation, told her that he had been to New Jersey, and that her father was worth $100,000. This was followed by the further evidence of Mrs. Ellicott, that about three or four weeks afterwards, she paid a visit to Miss Colvin, who said, "I wanted to see you, to tell you I had made a will, leaving you a legacy, but Colvin says your father is worth $100,000, and you will have more than the others, and I must not give you any thing."

Now the only issue to which the evidence of Mrs. Ellicott had any application, was the *second*, and the object was to

show by it that Miss Colvin was so influenced by the sugges-
tion of the appellee, that Elisha Warford was worth $100,000,
that no legacy was given to Mrs. Ellicott, the only child of
Elisha Warford.    It was therefore important that the appellee
should contradict this testimony, so far as was in his power.    If
he went to New Jersey *at all* to ascèrtain the pecuniary con-
dition of Elisha Warford, it was relevant to show that he went
there for an honest purpose, unconnected with the making of
the will of 1848.    It was therefore pertinent to show that
when he did go thither, he went for the purpose of ascertain-
ing the sufficiency of Elisha Warford, as the proposed surety
of Mr. Ellicott, as receiver in the lunacy case.    It was also
important to show that *the time* of his visit was subseqnent to
the date of the will of 1848.    We wished to take from the
testimony of Mrs. Ellicott some of the facts to which she tes-
tified, and we had the right to show that Shrope, the collector,
to whom the appellee made application *afterwards*, and was
the person to whom the application would probably be made,
had not seen him in 1847.    If the fact had been conceded, or
if the statement had been permitted to pass *as coming from
himself* without any effort on his part to show the contrary,
that the appellee went to New Jersey in 1847, for the purpose
of ascertaining the pecuniary condition of Elisha Warford,
this circumstance would have greatly strengthened the evi-
dence of Mrs. Ellicott.    If, on the contrary, it was shown
that he did not go there at that time, or at any time prior to
the will of 1848, for any such purpose, then it would follow
that he could not, in 1847, have said to Mrs. Ellicott that he
had been to New Jersey, and had there ascertained her father's
wealth, *unless he told her a wilful and deliberate lie*, and by
thus narrowing the question to the inquiry, whether he made
such statement in 1847, the evidence of Mrs. Ellicott being
unsupported by the collateral fact of an actual visit in 1847,
and further evidence being offered tending to prove that his
visit for such purpose was after the will of 1848 was made,
the caveatee became entitled to the full benefit in his favor of
the legal presumptión of his innocence, and justified the argu-

ment that Mrs. Ellicott was mistaken as to the date of the conversation to which she had testified. How far this legal presumption, in connection with the temper and deportment of the witness as exhibited in court, the fact that she was a disappointed expectant of testamentary bounty, together with the other evidence in the cause, would have justified the jury in believing that she was mistaken, was not the province of the court to decide. The evidence was properly admitted for what it was worth for the consideration of the jury.

It will be noticed that the second exception is taken to the *admissibility*, not to the *effect* of the offered evidence. They do not except to our offer, but make their objection in *advance*, and require us to state for what purpose we offered the witness. They then permitted us to go on and give the proof, and then except to *all* the testimony for the purposes for which it was offered. It is conceded that the *purposes* for which we offered the witness were *legal, competent, admissible* and *material*. Now what is the meaning of the objection? It is said, that if this testimony was not admissible for *any one* of the purposes for which it was offered, it was improper to admit it. But this is an entire misapprehension of the law, and is only applicable to *prayers* presenting alternate hypotheses, any one of which being erroneous, will vitiate the instruction. 5 *G. & J.*, 223, 225, *Md. Ins. Co. vs. Bathurst.* The objection was a *general one*, that the testimony was not admissible for the purposes for which it was offered. The counsel for the caveators were therefore bound to frame a prayer asking that the testimony should be rejected upon a specific ground, which the prayer must point out; for if admissible for any of the purposes offered, it was properly admitted. 3 *Md. Rep.*, 251, *Nailor vs. Bowie.*

It was open to the caveators to argue before the jury that Mrs. Ellicott was not mistaken, and that proof of the affirmative fact, that the appellee was in New Jersey in 1852, and then saw Shrope for the first and only time, did not prevent the caveators from showing that he was, in fact, there in 1847, or, without proof of such presence, from contending that he

was there in 1847, and saw some other person than Shrope, or from contending that on the unsupported evidence of Mrs. Ellicott, they ought to believe that he had made such representation precisely as stated by her. Besides this, the exception was to *all* the testimony of Shrope, for the purpose for which it was offered. If *any part* was admissible, the exception *pro tanto* was too broad. The evidence in part related to the actual pecuniary condition of Elisha Warford, and whether that evidence, in connection with the other evidence in the cause, proved that he was worth $100,000 or not, was for the jury to determine, and certainly on the point of alleged misrepresentation as to the condition of Elisha Warford, evidence of his actual condition was relevant and admissible.

But again, there is nothing to show that Elisha Warford was *not worth* $100,000. The prayer assumes that it was true, and there is nothing in the case to show that he was *not worth* that sum. The *onus* is upon them to prove this negative. They must prove the statement to be false. This they have not done; on the contrary, Mrs. Ellicott does *not deny it;* she did not contradict it when repeated to her by Miss Colvin. We say, then, that even if the ruling in this exception was wrong, the judgment ought not to be reversed. Our positions therefore, upon this exception, are:

1st. That the evidence of Shrope was admissible for the purpose of showing (should it avail with the other evidence in the case,) that Mrs. Ellicott was mistaken as *to the time* of the alleged conversation with the appellee.

2nd. That it was admissible for the purpose of showing that the representation, if made by the appellee, as to the pecuniary condition of Elisha Warford, *was true*, and was not a *misrepresentation*. All that we had to do, was to show that this evidence *tended* in some degree to show that the statement was true. Does not this evidence do this? It shows that he was worth at least $60,000; he himself swears to this; and it is uncontradicted; and, besides, it shows that he *owned lands in other places*.

3rd. That proof of the *fact* that the appellee never applied

but once, and in 1852, to Shrope for information as to the pecuniary condition of Elisha Warford, was a circumstance which, with other facts and circumstances stated in the third exception to have been given on the part of the caveatee, tending to support his side of the second issue, the caveatee was entitled to have submitted to the jury as part of his *rebutting* evidence. 6 *Md. Rep.*, 295, *Townshend vs. Townshend.* 1 *Md. Rep.*, 14, *Milburn vs. The State.* As *rebutting* evidence that may be admissible which would be inadmissible as original testimony. 20 *Conn.*, 254, *Barnes vs. The State.* 12 *Pet.*, 151, *Zacharie vs. Franklin.*

4th. That it was admissible for *all the purposes* specified respectively in the preceding points.

5th. That if admissible *for any* of these purposes, this second exception is not well taken.

6th. That if any *part* of this evidence was admissible for any one of the purposes indicated, the *exception* being taken to the *whole*, cannot be sustained. 1 *Md. Rep.*, 474, *Waters vs. Dashiell. Ibid.*, 337, *Middlekauff vs. Smith.* In the search after truth, every door should be open, and every fact tending to illustrate, modify or rebut any fact proved in the case should be admitted, and especially where imputations of *fraud* are cast upon a party, any evidence, however slight and otherwise inadmissible, will be admitted as *rebutting* testimony. If any part of the testimony is admissible, it should be admitted, and the particular part of the objectionable testimony must be specifically excepted to and pointed out. 14 *Penn. State Rep.*, 471, *Brown vs. Clark.* 1 *Pet.*, 328, *Elliott vs. Piersol.* 2 *Do.*, 44, *Columbian Ins. Co., vs. Lawrence.* 13 *Do.*, 310, *Moore vs. Bank of Metropolis.* 3 *Gill*, 220, *Budd vs. Brooke.* 3 *Md. Rep.*, 255, *Nailor vs. Bowie.* 6 *Do.*, 295, *Townshend vs. Townshend. Ibid.*, 407, *Hatton vs. McClish.* 3 *Do.*, 178, *Emory & Gault, vs. Owings, et al.* 5 *Do.*, 37, *Wright vs. Brown. Ibid.*, 552, *Tyson vs. Shueey.*

7th. That the *effect* of this evidence was not necessarily involved in the question of its admissibility. 1 *Md. Rep.*, 474, *Waters vs. Dashiell.*

76    v.7

8th. That the exception does not show that the points, or either of them, relied on by the appellants, were or was made and decided in the court below.

9th. That even if there was error in the admission of this evidence, still the appellants are not entitled to ask a reversal, as in any event they are not interested in the question of the validity or invalidity of the will of 1848. The findings of the jury in relation to the will of 1845, fully establish that that was a valid will, and had not been revoked, except by the will of 1848. The will of 1845 disposes of the entire estate, and therefore, in any event, the appellants claiming as heirs and distributees solely on the ground of alleged intestacy, have no cause of complaint against the will of 1848, because the will of 1845 shuts them out, and they have no interest to file a *caveat* against that of 1848. 5 *Md. Rep.*, 324, *Maurer vs. Naill.*

2rd. If it be conceded that the rulings of the court in the *third exception* are erroneous, still the judgment will not be reversed, because the appellants have suffered no injury thereby, if the will of 1848 be sustained, and therefore they cannot complain. 9 *Gill*, 56, *Ramsay vs. Glass.*

But these rulings *are correct.* The destruction of a *second will* operates *per se* to revive and republish a preceding one. Upon this point the language of the act of 1798, ch. 101, is conclusive.

MASON, J., delivered the opinion of this court.

The first exception presented by this record, relates to the witness, Rachel J. Warford, a devisee and legatee under both of the wills of Miss Colvin. As such, she was supposed to be incompetent to give evidence, upon the ground of interest. Before appearing as a witness, she had duly executed two instruments or deeds, purporting to convey all her interest under said wills. We have no doubt that those papers were duly and legally executed, and that they were, upon their face, sufficient in law to pass the whole interest or title of the grantor. It was, however, with some show of reason, contended, that those deeds

having been made merely to restore the competency of the witness, and not being *bona fide* conveyances, are to be regarded as a fraud upon the law, and therefore not effectual to accomplish the purpose intended. Though we have no doubt that such was the design of this transaction, still this court cannot assume as a legal fact, as the case is now presented, that the deeds in question were not executed in good faith. But whether they were or were not, they are sufficient forever to conclude the grantor from assailing them upon any such ground, and for this reason her divestiture of all interest under these testamentary papers, may be said to be complete, by virtue of the deeds in question, and therefore she is a competent witness.

Besides, this practice, by which witnesses have been restored to competency at the trial, by executing releases, deeds, or other instruments, has so long prevailed in Maryland, and been so long sanctioned by all our courts, that it may now be regarded as so firmly established as not to be disturbed, however disposed we might be to discountenance it, if it were now for the first time resorted to. These views, we think, do not conflict with the principle settled in the case of *Crawford vs. Brooke*, 4 *Gill*, 213.

We see no error in this exception.

The second exception relates to the testimony of the witness Shrope. When the caveatee proposed to examine this witness, he was *objected to* by the other side, but the record does not disclose upon what ground the objection then rested. Such an objection, at such a time, must go to the *competency* of the witness, and not to the *admissibility* of his testimony, for until the evidence is *offered*, no question of admissibility could arise. The legal presumption being in favor of the competency of every witness produced on the stand, no objection to the competency of such witness should be entertained, unless the party making it discloses at the time the ground upon which the objection is based. A mere general, indefinite objection will not avail. Hence the objection in this case, to Shrope, was improperly made, and the caveatee was not bound to state any special purpose for which he was offered, or to show, until the contrary was at least *prima facie* established, that the

party was a competent and legal witness.   The facts to be disclosed by this witness, if admissible for any purpose, might have been offered *generally*, as all legal and pertinent evidence for the most part may be offered.   *Goodhand vs. Benton*, 6 *Gill & John.*, 488.   But the caveatee did not avail himself of his legal rights in this particular, but proceeded to assign three several objects in the alternative, for which the evidence was offered, each of which, in the then aspect of the case, was a legitimate subject of proof.   By the case of *Goodhand vs. Benton*, just cited, it may be regarded as settled, that if evidence offered for a particular purpose, be inadmissible for that purpose, though admissible generally, or for some other object, it may be properly rejected.   Acknowledging this principle to be sound, it would follow, that if the evidence of Shrope had been inadmissible *for all* the special objects for which it was tendered, though perchance it might be legal evidence for some other purpose, it should have been rejected; and the appellants contend that the principle should be carried to the extent of determining that unless admissible for *each and all* the several purposes for which it was offered, it should not have been received, and this is the main point involved in this exception.

The testimony of Shrope, if applicable at all to the issues in the case, might have been offered *generally*, as we have already shown.   If it were competent testimony for any purpose, it must be presumed to have been for one or the other of the subjects for which it was alleged to be offered; at least no attempt was made to use it for any other.   If it could have been offered for *no other purpose*, does it not follow that the offer was virtually a *general offer*, even though, in point of fact, the testimony may not have been legally applicable to all of the points to which it was declared to relate?   If there be any reason why the omission to mention *all the purposes* for which the testimony might be applicable, when you have attempted to name some, would be fatal to its admissibility for the purposes not mentioned, it must be because the opposite party might be thereby misled, and prevented from fortifying himself with rebutting testimony upon the point, in reference to

which he may have been led to believe the testimony was not to be used. While the omission to mention all the purposes to which this testimony might relate, might have such an effect, it is difficult to imagine why such a result, or why any other inconvenience could follow from enumerating among the proper purposes for which testimony was offered, others for which it was not. The question resolves itself then into this, was the testimony admissible for any of the purposes for which it was offered?

An attempt had been made on the part of the caveators to show, by Mrs. Ellicott, that Miss Colvin, the testatrix, had been deceived by false representations made by Colvin Warford, as to the pecuniary condition of Elisha Warford, the father of Mrs. Ellicott, by which the latter lost a legacy which she supposes she would otherwise have received. It is said he represented Elisha Warford to Miss Colvin as being worth $100,000. If this were a fact, or if he honestly believed it to be a fact, there was no impropriety in Warford's having mentioned it to Miss Colvin, let his motive for doing so be what it may. The caveatee offered Shrope, at this juncture of the case, as he stated, "for the purpose of contradicting Mrs. Ellicott, or impeaching her, by showing that she was mistaken as to the time of said conversation, if any was had, or that the statement of said Warford, in said conversation, if it was had, was true."

"The caveatee then proved by said Shrope that he was one of the assessors of one of the townships of Hunterdon county, New Jersey, where Elisha Warford, the father of Mrs. Ellicott, resided; that he had been assessor of taxes for nine years, once in 1840 to 1846, and was again appointed in 1850, and has continued to act as assessor from that period until the present time; that in 1852 Colvin Warford called upon him to ascertain what was the amount and value of Elisha Warford's estate, that Elisha Warford was going security upon a bond in Maryland; that witness showed to Colvin Warford the assessment of Elisha Warford's estate, which was ten thousand dollars worth of real estate, and that he owned land in other places; that his personal estate was valued at ten thousand five

hundred dollars, clear of all debts due by him; this amount being handed in by Elisha Warford, and witness concurring with him in that sum, he was accordingly assessed therewith; that he was assessed with debts due him on bonds, mortgages and notes to the amount of ten thousand dollars, and that his name or bond would be good in that county for thirty thousand dollars; that the defendant never called on witness at any other time than that above mentioned, for the purpose of ascertaining the amount of Elisha Warford's estate, nor did he at any other time give to said Colvin Warford any other statement than that above mentioned."

To the admissibility of all of which testimony of said Shrope, for the purpose for which it was offered, the counsel for the caveators objected, but the court overruled the objection and permitted the evidence to go to the jury.

One of the purposes, then, assigned for offering this testimony, was to show that this statement of Warford was made in good faith.   The issue thus collaterally arising was simply, was or was not the statement true, that Elisha Warford was worth $100,000?   Nothing could be clearer than that if each of four witnesses had proved a separate estate in Warford, respectively worth $25,000, or more, that the affirmative of the issue would be established.   To prove, as Shrope did, that Warford was worth $30,000, "and that he owned land in other places," is certainly a step, and an important step, towards establishing the issue in dispute.   It was for the jury to say whether the whole amount of $100,000 was made up or not. Shrope surely proved a material part of that sum, and his testimony was therefore clearly admissible.   This precise point was determined in the case of the *Plank Road Co. vs. Bruce*, 6 *Md. Rep.*, 457.   In that case the plaintiff was prevented by the inferior court from offering evidence to establish a *part* of his case, unless he showed in advance his ability to prove his *whole case*.   This court pronounced this ruling erroneous, as the testimony offered was *per se* admissible, and its insufficiency to establish the whole case, was a question to be determined by the jury, upon a prayer properly framed.   In that case the court say: " These questions cannot arise upon the ad-

missibility of evidence, but must be presented by prayers after the evidence has been closed.'' See, also, *Nailor vs. Bowie*, 3 *Md. Rep.*, 251.

But it has been said, that as this evidence was received for all or either of the three purposes for which it was offered, unless it was legally applicable to each, the jury might have been misled, and applied it to one of the purposes to which it did not relate. To avoid such a result, it was the duty of the counsel objecting to have pointed out specifically the purpose to which the testimony had no legal application, and to ask its exclusion for such purpose. A general objection to testimony which is *per se* applicable to the case for any purpose, will not be sustained, though inapplicable for other purposes; and such general objection would leave the testimony to go to the jury as if no objection had been made at all; in other words, it would be virtually an offer *generally* of competent testimony. Under such circumstances, suppose, in argument before the jury in this case, the counsel for the appellee had endeavored to show that besides the testimony's tending to establish that the statement of Warford was true, it also contradicted the previous statements of Mrs. Ellicott, when, in fact, if it had been offered solely for the latter purpose, it would have been rejected as illegal evidence, what would have been the effect? Could the judgment have been reversed upon the assumption that the jury made an improper, instead of a proper application of the evidence? Surely not! We must assume, where evidence has been offered generally, that it will be applied by the jury to the purposes to which it is legally applicable; and if counsel wish to guard against the contingency of a misapplication of the evidence by the jury, they should ask the court, as has been already said, to point out the branch of the case to which the evidence is not to be applied.

Again, it has been said this testimony was not admissible for the particular purpose of showing that in 1848, Elisha Warford was worth $100,000, because it did not relate to that precise period, but referred to his condition in 1850 or 1852, and the case of *Keedy vs. Newcomer*, 1 *Md. Rep.*, 241, is relied on to support this view. The cases are different in several par-

ticulars. In the case cited, the testimony which was excluded was *primary evidence* offered by the plaintiff to support his case. He had sued the sheriff, the defendant, for a false return of *nulla bona* to a *fi. fa.* The evidence was excluded because the *precise time* when the debtor had property was the very essence of the issue, while the testimony related to a period more than a year removed. The issue in the present case is not so much the *precise time* when Mr. Warford was worth $100,000, as it was the *truthfulness* and *honesty* of Colvin Warford's statement upon the subject. And again, in the case before us, the testimony was *rebutting evidence;* and it must be further remembered, that the testimony of Shrope was not the only evidence in the case upon this point. Mrs. Ellicott, the caveator's own witness, to refer to no other, furnishes a most pregnant fact upon this part of the case. When Miss Colvin told her of the statement of the extent of her father's fortune, as a reason for not giving her any thing, *she did not deny it.* This circumstance might have been regarded by the jury as virtually an admission of the truth of the statement, and we think that upon this evidence, and that of Shrope alone, the court would have been right in submitting to the jury the question of whether Elisha Warford was or was not worth $100,000. As to the sufficiency of this evidence to establish the fact, we say nothing; it was for the jury alone, upon a properly framed prayer, to say whether the issue was proved or not. We are of opinion that the caveators have secured all they had a right to ask under the law, in the then aspect of the case, by having had granted by the court below the following prayer, which, we think, covers this entire branch of the case:

" If the jury find from the evidence, that Rachel Colvin, in excluding Mrs. Ellicott from the will of 1848, was influenced by the representation of Richard C. Warford, that her father, Elisha Warford, was worth one hundred thousand dollars, and shall further find that such representation was untrue, and that the will of 1848 was the result of such misrepresentation, then the verdict on the second issue must be for the caveators."

The third exception relates to the refusal of the court to

grant certain of the caveators' prayers, which relate to the wills of 1845 and 1847. The ruling of this court upon the two previous exceptions, render any decision upon the third unnecessary.

Upon a proper state of pleadings and evidence, and upon correctly framed prayers, the validity of the will of 1848 was distinctly drawn in issue upon this trial, and sustained by the verdict of the jury. That will revoked all prior wills. Does it not therefore follow, that all the questions presented in this record, as to the wills of 1845 and 1847, become wholly unimportant and valueless in this aspect of the case? What matters it, whether the will of 1845 was revived or not by the cancellation of the will of 1847? Or what matters it, whether the will of 1845 was surreptitiously withheld or not from Miss Colvin by Warford? These all might well have been all-important questions, if the will of 1848 had not been sustained. But there being no error in the law, as disclosed by this record, upon which the will of 1848 was sustained, we are not willing, for the purpose of granting a new trial in regard to that will, to overrule the court below upon questions wholly immaterial and irrelevant.

*Judgment affirmed.*

Eccleston, J., dissented.