(Decided June 28th, 1860.)

## NATIONAL FIRE INSURANCE COMPANY OF BALTIMORE *vs.* WM. CRANE.

Where a court of equity is asked to reform a written contract, on the ground of mistake, the mistake charged must be proved in the most clear and unequivocal manner; the proof must be free of all reasonable doubt, almost, if not quite, incontrovertible, and clear and overwhelming.

An insurance policy, insuring A and making *"the loss, if any, payable to"* B, is to be regarded as having been, at its inception, assigned to B with the assent of the company, and he is entitled to its benefit without procuring a transfer of the policy from A assented to by the company, as in ordinary cases.

Courts of justice must regard all the parts of a transaction, and impute to the parties a motive for doing or saying what the case discloses; every fact and declaration must be considered as the result of design or agreement, and the intent of the parties should have effect, if it can be done consistently with established rules.

A release to qualify a witness, must be given before the testimony is closed, or it comes too late; but, if the trial is not over, the court will permit the witness to be re-examined after he is released, and it will generally be sufficient to ask him if his testimony, already given, is true, the circumstances under which it was given going only to his credibility.

The fact that a party transferred his interest for the purpose of becoming a witness, does not disqualify him, however it may affect his credibility.

The president and secretary of an insurance company, not being stockholders therein, are competent witnesses for the company in an action upon a policy executed by the company.

Where the fact of a prior insurance was *notified* to the company at the time the policy was issued, the want of the *endorsement* of such prior insurance on the policy, cannot be urged in *a court of equity*, in a cause otherwise free from objection, whatever effect it may have *at law*.

The endorsement of a prior insurance on the policy could only have been made by the company, and if omitted, the assured is not at fault, if he has *notified* the company of the existence of such prior insurance.

There is a distinction in cases where the preparation of an instrument belongs to the party to become liable under it; he ought to be dealt with more strictly, and insurance contracts are within this principle.

Equity will interpose not only in cases of fraud but also of mistake, where a policy is drawn up in a form different from the application, or any thing is omitted which it was the duty of the company to insert or endorse on the instrument.

APPEAL from the Circuit Court for Baltimore City.

The bill in this case was filed, on the 29th of June 1855, by the appellee, against the appellant and one Jas. L. Gray, surviving partner of the firm of "J. L. Gray & Brother," composed of the said Jas. L. Gray and George P. Gray, praying that the appellant may be compelled, by decree, to pay to the complainant the sum of $2000, with interest, the amount for which a policy of insurance, issued by the appellant, was renewed and continued, and that this policy, and the endorsement thereon, may be altered and reformed, if need be, so as to represent the true agreement between the parties, as set forth in the bill, and that the mistakes, alleged and charged in the bill, may be corrected, and for general relief.

The original policy, dated the 14th of January 1854, states, that the company "Have agreed to insure, and do hereby insure, *J. L. Gray & Brother* against loss or damage by fire, to the amount of $4000:—on brick steam mill situated in Carpenter's Alley, between Eutaw and Paca streets, $1000; on steam engine and whiting machinery, $1000;—on Sumac, ground and unground, in said mill, $2000. *Loss, if any, payable to W. Crane & Co.*—as per application." It was to continue for one year, and contains in its body, among others, this stipulation: "And provided also, that in case the assured shall have already any *other insurance* made on the hereby

insured premises, he *shall notify* the same to this corporation before or at the time of executing this policy, and *cause the same to be endorsed thereon;* otherwise this insurance shall be void and of none effect.'' The *fourth* of the conditions accompanying the policy, and subject to which it was made, provides that: "The person for whose interest the insurance is made, must be declared and named therein; nor can any policy, or interest therein, *be assigned but by the consent of the company, expressed by endorsement made thereon.*'' It was endorsed thus: "National Fire Insurance Company, office No. 13 South street. Policy No. 859—*To J. L. Gray & Brother.* Dolls. 4000.—Premium $80.—Five per cent. discount as Fireman, $80.—Policy 1, $81. Date January 14th, 1854. For one year.—Terminates January 14th, 1855.'' On the 13th of January 1855, it was renewed by the following endorsement thereon: "Payment of the premium for continuing the insurance by this policy is acknowledged to have been received as follows: Date of receipt, January 13th, 1855.—Premium received, $40.—Sum insured $2000; that is, $1000 on engine and machinery, $1000 on building, as described. Secretary's signature,—Jno. R. Magruder.''

At the time this policy was issued, the Grays held the property, under a bond of conveyance from E. H. and F. Stabler, and the firm of Wm. Crane & Co., composed of the complainant, and James C. and Andrew F. Crane, had made large advances of money to the Grays, a large part of which was expended in building the factory, and supplying it with proper machinery, and this money was advanced in consideration that the Grays would assign to the Cranes, as security therefor, the property and premises which they held. On the 3rd of October 1854, the Grays executed to Wm. Crane & Co., a deed of assignment of all their interest in the property. On the 1st of January 1855, the partnership of Wm. Crane & Co. was dissolved, James C. Crane retiring from the firm, and assigning by deed all his interest in the partnership, and particularly in the property insured, to his two co-partners, who continued business under the firm of W.

Crane & Son, as the successors of Wm. Crane & Co. And on the 17th of February 1855, the Stablers executed a deed conveying to W. Crane & Son, the legal title to the property, the equitable title whereof had been previously assigned by the Grays to Wm. Crane & Co.

A fire occurred on the 23rd of March 1855, by which the factory, &c., was totally destroyed, and the loss incurred exceeded the amount of the insurance, and the company refused to pay this loss, upon the grounds:

1st. That J. L. Gray & Brother were the parties insured, and, before the fire occurred, they had parted with all interest in the property insured, and the policy was never assigned to W. Crane & Co., or Wm. Crane & Son, as required by the fourth condition thereof.

2nd. That at the time the policy was issued, there was a prior outstanding insurance in the Firemen's Insurance Company, which was not notified to the company, and endorsed on the policy, and therefore the policy never attached.

Andrew F. Crane, then, by an endorsement on the policy, under his hand and seal, dated the 30th of April 1855, "for value received," assigned all his "title and interest in this policy, and all advantages to be derived therefrom," to William Crane, who, on the 29th of June following, filed the bill in this case.

The bill alleges and charges, among other things, that the defendant, the National Fire Insurance Company, was fully notified of the equitable and substantial interest of Wm. Crane & Co., in the property insured, at the time the policy was issued,—of its standing as security for money loaned by them to the Grays, and expended thereon,—and of their purpose to be secured therein by the insurance, and that the insurers meant to insure the interest of Wm. Crane & Co. in the property, and executed and delivered the policy for that object and with that view, and made the loss, if any, payable to Wm. Crane & Co., with full knowledge of their interest, and for the purpose of protecting them; that the defendant also knew of the outstanding insurance in the Firemen's Insurance Company, having been informed thereof both by

A. F. Crane and J. L. Gray, and that the defendant's policy was issued with notice of that previous insurance, and its non-endorsement on the policy was the neglect and default of the defendant and its agents, and not of the complainant, or of Wm. Crane & Co.; that the policy was received, and the premium paid, in good faith, by A. F. Crane, without particular scrutiny, as it was believed to be what it should have been as to its contents and endorsements, Wm. Crane & Co., having relied upon the defendant and its officers to do the duties required of them by their regulations, as they had furnished them, in good faith, with all necessary information preliminary to the issuing of the policy; that if the policy was informal and incorrect, it was accepted through mistake, and in the belief that it was properly made out in all respects, so as to embody the wishes and objects, and to secure the interest, of Wm. Crane & Co., and if the policy was not properly made out, as well with reference to its contents as to the endorsement relative to the prior insurance in the Firemen's Company, Wm. Crane & Co. were deceived and misled, and mistaken in paying the premium therefor, and that it should be reformed and corrected, so as to embrace the provisions and endorsements sufficient to express the intentions, and secure the interests, which Wm. Crane & Co. designed should be expressed and secured thereby, and which the assured believed to have been duly done.

The bill also charges that the policy was renewed and the reinsurance effected thereunder, as the original insurance was, with full knowledge on the part of the defendant, its agents and officers, of the interest of Wm. Crane & Son in the property insured, and also with full notice and knowledge of the outstanding insurance in the Firemen's Company; that it was the purpose of the renewal to secure Wm. Crane & Son in the premises, and to provide in due form for the previous insurance in the Firemen's Company; that Wm. Crane & Son entrusted the preparation of the endorsement of the previous insurance to the defendant, its officers and agents, they believing and confiding that the memorandum and policy would be prepared in like good faith, and they accepted the

renewal as sufficient, in all points, to carry out their expressed wishes and to secure their known interests; that if the memorandum and policy are defective, and fail to carry out the wishes and intentions of the parties, they were accepted by mistake by Wm. Crane & Son, and should be so reformed as to comport with the intentions and agreement of the parties, and to prevent the fraud and detriment which would be wrought by such mistakes or negligence on the part of the insurers to the insured, and that the mistakes and default, and omissions of the policy are or were the mistakes and omissions of the insurers, committed with full knowledge, either intentionally to defraud or by gross neglect, for which the insurers are responsible, after full notification in every particular.

The answer of the company denies all knowledge of the prior insurance in the Firemen's office, either at the time of the original insurance, or at the time of the renewal of the policy, and also denies any knowledge of the conveyance by the Stablers to Wm. Crane & Son, until after the fire. It insists upon the invalidity of the policy by reason of the want of notice of the prior insurance, and also insists upon the termination of the insurance by reason of the cesser of interest in the assured J. L. Gray & Brother, prior to the fire. All fraud and all neglect, wilful or inadvertent, on the part of the company and its officers, are denied; and the alleged mistakes or surprise in the issuing and renewal of the policy are denied, and the answer insists that the policy and renewal are precisely such as they were intended to be by the parties at the time.

*Andrew F. Crane* was examined as a witness for the complainant, and his testimony was excepted to, upon the ground that he was not a competent witness in this case. Upon the question of competency the witness says, on cross-examination, that the assignment of his interest therein, endorsed upon the policy, to his father, Wm. Crane, was made on the day of its date—the consideration for it was a subscription of $500 to the African Baptist Church, which witness made in the spring of 1854, and which his father paid. In reply to

the question: "Was the object of said assignment, on your part, to enable you to become a witness aud testify as such in this case? he says he "made a full and *bona fide* release of it, and his object was to give money for a benevolent purpose." The same question being repeated, and a direct answer requested, he says: "That if witness must answer the question directly, he was determined that the money should go to a benevolent purpose rather than that the National Fire Insurance Company should have it; it was not the amount of the money but the *principle* that he looked at." Being again asked: "Suppose the present suit should not be successfully prosecuted by your father, do you intend that the said subscription shall be lost to the African Church, or do you intend, if paid by your father, that the loss shall be borne by him?" he replied: "That the subscription has been paid to the church; in the event inquired of, witness intends that the loss shall be borne by his father." Being re-examined in chief, he stated that the assignment of his claim, under the policy, was made in good faith, without secret understanding or reservation of any kind whatever, and that he can neither gain nor lose by the result of the present controversy.

*James L. Gray*, one of the defendants, was also examined as a witness for the complainant, under the usual leave of the court to that effect. After his examination had been concluded, Wm. Crane & Son executed a release to him and his trustee in insolvency, for any responsibility which either of them might be or remain under to Wm. Crane & Son, in the event of the inability of Wm. Crane to recover the amount claimed in this cause under this policy, which was accepted by the witness and his said trustee. The witness was then re-examined by being asked: "Have you since receiving said release re-examined your testimony as given on your previous examination-in-chief? If yea, please state whether the same is or is not correct and true to the best of your knowledge, and whether you have any, and what correction to make in the same in any particular?" to which he replied: "That he has read his said testimony again carefully, and, to the best of his knowledge, it is true and correct, ex-

cept in one particular," which he specifies and corrects. The defendant excepted to *all* his evidence upon the ground that he was not a competent witness in the cause, and also particularly to the evidence given upon his re-examination, because it was not taken in such manner as required by the rules and practice of the court.

*John B. Seidenstricker*, the president, and *John R. Magruder*, the secretary, of the National Fire Insurance Company, were examined as witnesses for the company, and the complainant excepted to their competency and to all their evidence, because they were the agents of the company in the transactions in controversy, and are interested to prevent the complainant's recovery, and their own liability over on account thereof to their principal, the company, for misconduct or negligence, and because they are otherwise incompetent to testify for the company. The president stated, on cross-examination, that he was not a stockholder in the company at the time of his examination as a witness, that he ceased to be one some six or eight months before, that the company's charter and by-laws do not require the president to be a stockholder, that he ceased to be a stockholder for two reasons: first, because he wished to become a witness in this case; secondly, because he is only a stockholder when stock is offered for sale which he does not wish to be thrown into the market, and in that case he purchases it himself and afterwards disposes of it, that he transferred his last stock to his son, who paid him value for it, and he has no understanding with regard to a re-transfer, and that he has no interest whatever in the result of this suit. The secretary stated that he is not a stockholder in the company and never has been one.

The testimony of the above and other witnesses, as well as the documentary proof is very voluminous and need not be set out at length. It is sufficiently stated, for a clear understanding of the case, in the following opinion of the court below, (KREBS, J.,) delivered upon passing the decree appealed from.

"The bill filed by the complainant seeks a decree against the National Fire Insurance Company to compel the pay-

ment to him of the sum of $2000 and interest, the reduced amount for which the insurance created by the original policy filed in this case, was continued for one year, as appears by the endorsement thereon, made by the company's secretary on the 13th of January 1855. The policy insured, "Jas. L. Gray & Brother," against damage by fire to the amount of $4000, on a brick steam mill, steam engine and whiting machinery and sumac, and made "the loss, if any, payable to Wm. Crane & Co." The interest that Wm. Crane & Co. had in this policy and in the property insured, has been transferred to the complainant. The property having been destroyed by fire, he claims the amount for which the insurance was continued. This claim is resisted upon the grounds:

"1st. That Jas. L. Gray & Brother had parted with all their interest in the said property before the fire occurred by which it was destroyed.

"2nd. That the parties insured had another insurance on the property at the time this policy was executed and continued, and that they did not notify the same to the defendant, and have the same endorsed on the policy or otherwise. acknowledged by it.

"The fact that J. L. Gray & Brother had assigned all their interest in the property insured, under the bond of conveyance from E. & F. Stabler to W. Crane & Co., and that they had obtained a conveyance of the same from the Stablers before the policy was continued, and before the fire occurred, is stated in the bill, but the complainant insists that this should furnish no objection to his claim for the amount insured, because Wm. Crane & Co. had an insurable interest in the property when the policy was executed, which they made known to the company, and for the insurance of which, the written application filed amongst the proceedings was intended, and that it was through the mistake and error of the company and its agents, that they and their said interest was not insured by the terms of the policy, as originally drawn, instead of the Grays and their interest, and that it was through the like error and mistake that their interest in the property acquired under the assignment to them, from the Grays, exe-

cuted before the policy was continued, and made known and exhibited to the company, was not insured in express terms, at that time, and that if their interest had been insured, which would have been done had not the company committed the mistake imputed to it, the transfer of the property made by the Grays, would have furnished no pretext for resisting the claim. The bill, therefore, prays that by a decree of this court, these mistakes and errors may be corrected, and that the said policy and the endorsement thereon by which it was continued, may be altered and reformed so as to represent the true agreement and contract between the parties as set forth by the complainant.

"The answer of the company denies all the errors and mistakes in these transactions that are charged by the complainant, or that it had any notice that the firm of Wm. Crane & Co. had an equitable or substantial interest, or any interest, whatever, in the property at the time the policy was made, or that it was intimated, intended or supposed by any one that they were the parties to be insured, or that the application for the insurance was made for that purpose, or that they had notice of the assignment to Wm. Crane & Co., as alleged in the bill, at the time the policy was continued, and avers that the policy and the memorandum of renewal endorsed thereon, are in precise accordance, in every particular, with the actual and intended agreement of the parties, and that in no particular is there any thing to be changed, corrected, altered or reformed.

"The complainant insisting that there was mistake and error in this policy of insurance, as it was originally executed, and in the memorandum subsequently endorsed upon it, by which it was continued, he must furnish such evidence of error and mistake as is demanded by the rules adopted by courts of equity in inquiries of this character. These rules require a high degree of proof. It is not necessary, for the purpose of showing what they exact, to refer to any other authorities than those that are found in the reported decisions of our own courts. In *Hall & Gill vs. Clagett*, 2 *Md. Ch. Dec.*, 153, the chancellor says, in reference to this rule of evidence:

'There seems to be but one sentiment among the judges upon this subject. The mistake must be made out in the most clear and unequivocal manner, and to the entire satisfaction of the court. There can be no question of the impropriety of interfering in such cases, unless the mistake is made out by evidence clear of all reasonable doubt.' In *Beard's exc'x vs. Hubble,* 9 *Gill,* 431, the court says that by this rule, 'it has been required by the party seeking to be relieved, upon the ground of mistake, to produce, if not quite, almost, incontrovertible proof, or to use the language of a distinguished chancellor, 'proof clear and overwhelming.' So in *Philpott vs. Elliott,* 4 *Md. Ch. Dec.,* 275, the chancellor says: 'This court has unquestionably the power to grant relief, provided a clear case of mistake be made out, but it is indispensably necessary that it be demonstrated in the *clearest* and *most unequivocal* manner, for if there be a reasonable doubt upon the subject, the court must withhold its aid. And it is not only necessary that strong evidence be produced, that the agreement signed by the parties does not conform to their intentions, but the correction proposed to be made must be established by equally conclusive proof. Before the agreement will be reformed and executed as reformed, the court must be perfectly satisfied what the real intention of the parties was.' In the case of *Showman & wife vs. Miller,* 6 *Md. Rep.,* 485, the Chief Justice, in delivering the opinion of the court, says: 'The aid of the court is invoked exclusively on the ground of mistake. In the case of mistake the Court of Appeals, in *Watkins vs. Stockett,* 6 *Harr. & Johns.,* 445, adopting the decision of Ld. Thurlow, in 1 *Brown's Ch. Rep.,* 92, observe, that the proof of a mistake should be established as much to the satisfaction of the court as if it were admitted, and that the difficulty of doing this is so great that there is no instance of its prevailing against a party insisting there is no mistake.' It is true that the chancellor, some years before, in the case above referred to, of *Hall & Gill vs. Claggett,* had expressed the opinion that this language of Lord Thurlow had been qualified by succeeding chancellors, but, nevertheless, the Court of Appeals,

in this late case of *Showman & wife vs. Miller,* repeats it with unqualified approbation as having been previously adopted by that court.

"Applying the tests, furnished by these decisions, to the testimony produced in this case, is the mistake here charged demonstrated in the clearest and most unequivocal manner, clear of all reasonable doubt, and to the entire satisfaction of the court? Is the proof almost incontrovertible? Is it clear and overwhelming? Is not only the agreement, set out in the instrument, proved by such testimony not to conform to the intention of the parties, but is the agreement, according to which it is to be reformed, proved by evidence equally strong? The mistake made at the time the policy was prepared and executed, is alleged to be this: that the company was applied to and directed to insure the interest of the Cranes in this factory building and property, and so understood the application, and so meant to insure it, but, by mistake, made out and executed the policy as an insurance of the interest of the Grays, 'loss, if any, payable to W. Crane & Co.' It is to be observed that, at this time, the Grays had an unquestioned interest in the property—which was their equitable title under the bond of conveyance from the Stablers,—and was a proper subject for insurance. W. Crane & Co. wished to be secured, for their advances to the Grays, by an insurance to the amount of $4000. This could have been as effectually accomplished, at that time, by an insurance in the mode in which it was actually made as it would have been by an insurance of the interest which they allege they themselves then had in the property. Both they and the Grays then having an interest in the property, there is nothing in the condition of the property, in regard to ownership, or in the object to be accomplished, which would raise the presumption that it must have been the intention of the parties to insure some interest that W. Crane & Co. had in the property, and not that of the Grays. And further, the mode adopted to secure these parties, seems to be that which they had in view when they agreed to aid the Grays. J. L. Gray, one of the witnesses for the complainant, says: 'W.

Crane & Co. agreed to loan to Gray & Bro. money, for which they were to assign the factory to them as security; there was no agreement between them with regard to insurance; *all the insurances of J. L. Gray & Brother were to be made payable to W. Crane & Co.;* it was so understood between them; witness told them that Gray & Bro. would see that the insurances *were made payable to them,* (W. Crane & Co.)' And Andrew Fuller Crane, *examined as a witness,* also, for the complainant, says, that on the promise of the Grays to assign to the firm of W. Crane & Co., the factory, &c., they consented to aid them, and that 'Jas. L. Gray & Bro. also agreed to assign to the firm of witness all right and title to all benefits from the policies on the property *then outstanding, and that the subsequent ones should be made payable to the firm of witness.'* I am of opinion, then, that the complainant cannot insist, with any show of reason, that W. Crane & Co., and Jas. L. Gray & Bro., contemplated, prior to the order for the insurance, any other than the very mode which was adopted, by insuring the interest of Jas. L. Gray & Bro., and making 'the loss payable to W. Crane & Co.' The written application for the insurance, in the handwriting of A. Fuller Crane, is in the name of Jas. L. Gray & Bro., for insurance for them, 'for the benefit of W. Crane & Co.' The policy as executed, insuring them or their interest, *'loss, if any, payable to W. Crane & Co.'* substantially pursues the order. The purpose of the complainant is to show, by parol evidence, that the contract or agreement, as expressed in this order and policy, was not the true agreement that the parties intended to make. *Prima facie* it was. The burden of proof, then, is on him to show, by evidence of the high order required by the decisions before cited, that there is a mistake in the order and policy.

". "The application of Wm. Crane & Co., to this insurance company, for the insurance which was effected, was made by A. Fuller Crane, in consequence of the company's refusal to make an insurance on this property upon the application of Jas. L. Gray, made *in the name of Jas. L. Gray & Bro.* Mr. Crane *knew* that it was made *in this form.* In his testimony

he says: 'Deeming the insurance then existing on the property, too small, witness suggested to *Jas. L. Gray* to apply to the National Fire Insurance Company to take a risk on said property, which said *Gray afterwards did, in the name of Jas. L. Gray & Brother.'* This application was refused, but there is nothing in the evidence to show that there was any objection to the application because it was made *in their name,* either on the part of the company, or of W. Crane & Co. Having first been made by Jas. L. Gray in the name of Jas. L. Gray & Bro., why should, or might, it not have been renewed by A. Fuller Crane, in the name of the same parties?

"The agreement for, and settlement of, the terms of this insurance, was made at the counting room of W. Crane & Co. Mr. Seidenstricker, the president of the company, Jas. L. Gray, one of the complainant's witnesses, and A. Fuller Crane, also examined on his behalf, were present, and the statement of what occurred at that interview, and the statement of the latter of what occurred in an interview with the president, in the street, a day or two before, in reference to an insurance on this property, furnishes the whole evidence relied upon by the complainant to show that this policy does not set forth the true agreement and understanding between these parties in regard to this insurance.

"Mr. Crane says, upon that occasion, 'he urged Mr. Seidenstricker, to *take a risk on the property.* Upon this Mr. Seidenstricker said, Mr. Gray how much does the Firemen's *charge you?* After some hesitation on the part of Mr. Gray,' Mr. Crane says, Mr. Gray answered, 'two per. cent,' and the witness, 'at Mr. Seidenstricker's request, commenced to write as Mr. Seidenstricker dictated the paper,' which was the application on which the policy was issued; 'witness wrote on said paper, *for the benefit of W. Crane & Co.;* after witness had repeatedly stated to Mr. Seidenstricker *all pertaining to the previous insurance* in the *Firemen's Insurance Company,* Mr. Seidenstricker took the paper and left the counting room.' In consequence of what passed at this interview, the policy of insurance was prepared, executed and presented to wit-

ness to witness, a day or two after, when he (A. Fuller Crane,) as he stated, 'took it up, read the outside of it, the amount of insurance,' and after the reply of the person who brought it, 'that it was all right,' to a question from him, (Crane,) he paid the premium. Upon the outside of it are the words: '*Policy No.* 859. *To Jas. L. Gray & Brother. Dolls.* 4000. *Premium* $80.'

"Mr. Gray states, in reference to this interview: 'Messrs. Crane and Seidenstricker commenced talking *about the insurance of the factory;* Mr. Seidenstricker asked Mr. Crane to make a memorandum, which Mr. Crane did, *Mr. Seidenstricker stating the manner in which it should be done;* viz: so much on machinery, *building, stock* After that memorandum was finished, witness told Mr. Seidenstricker *that Jas. L. Gray & Brother had an insurance in the Firemen's Insurance Company,* which the witness afterwards informed Mr. Seidenstricker,' as Mr. Gray states, 'was two per. cent.'

These statements certainly do not furnish the conclusive proof required by the rule of evidence, that the true agreement between these parties, and understanding for insurance was not the contract embodied in this policy, or that Mr. Crane intended, and Mr. Seidenstricker understood, that *it was the property or interest of W. Crane & Co. that he was asked to insure.*

"But giving to the complainant the benefit of the testimony of Mr. Crane in regard to what passed between him and Mr. Seidenstricker at the interview in the street, the evidence is, in my opinion, still greatly deficient in the requisites of clear, conclusive, most unequivocal, and almost overwhelming proof of mistake. The witness gives the words used by them as nearly as he can recollect them: 'Mr. Seidenstricker, why would you not take a risk *for us* on that *factory concern of ours* in Carpenter's alley?' Mr. Seidenstricker instantly said: ' *That factory of Grays?* I did not know you had any thing to do with it.' Witness answered: 'Yes sir,—*we have a very big interest in it—we have advanced largely on the property and stock,* and we want to feel insured; *the Firemen's Insurance Company have insured*

*on it for us.*' Mr. Seidenstricker's reply was that the subject had been before their directors, but they had declined on account of the property being worked by steam, and fearing some trouble with the neighbors, &c., however, he said, 'I will go and look at the property again, and when our board fully understands it, I will call and see you.'

"All that was mutually stated by these parties in reference to this insurance is comprised in the above extracts from the testimony, and it is from them that the question of mistake is to be decided. It is to be observed that the mistake alleged in the original insurance, refers only to the *subject* of the insurance which the complainant alleges should have been the interest of W. Crane & Co., and not that of the Grays. At the counting-room not a word was said about the interest to be insured as differing from that for which the application had been previously made, which, as Mr. Crane says, was made *'in the name of J. L. Gray & Bro.'* The application, as written by Mr. Crane, was for insurance *for these parties.* The memorandum was made according to the direction of Mr. Seidenstricker, as Mr. Crane says, but Mr. Gray describes this dictation as a simple statement by Mr. Seidenstricker, as 'so much on machinery, building, stock.' Before, however, it can be made to appear that his dictation was erroneous, conceding that he had directed Mr. Crane to state the application in the name of J. L. Gray & Bro., it must be shown clearly and conclusively that Mr. Seidenstricker had been distinctly informed that the *interest* which the parties *wished* to *have insured* was that of *W. Crane & Co.* There must be no reasonable doubt on the mind of the court that this was intended. When the policy was executed and delivered to Mr. Crane, the part which he admits was read by him showed that the *interest insured was that of J. L. Gray & Bro.*, and yet he *retained it without objection.* Mr. Crane at no time, in his conversation with Mr. Seidenstricker, referred to the interest of W. Crane & Co., in connection with this property, except at the meeting between them in the street, when he asked Mr. Seidenstricker, 'to take *a risk* for *us* on *that factory concern* of *ours,* in Carpenter's alley.' The application

having been previously made to insure it as the property of the Grays. Mr. Seidenstricker instantly said: *'That property of Grays?* I did not know that you had any thing to do with it.' Mr. Crane replied: 'Yes sir,—we have a big interest *in it.*' In what? Mr. Seidenstricker must have understood him to mean in that *'property of Grays.'* And Mr. Crane goes on to explain how that interest had been created—'*we have advanced largely* on the *property* and *stock,* and we want to feel insured.' He did not tell Mr. Seidenstricker that *he wanted* the *property* and *stock* insured, but that *they wanted to feel insured,* which would have been done as well by insuring the property as belonging to the Grays, 'loss payable to W. Crane & Co.,' as in any other mode. In this same conversation he says to Mr. Seidenstricker: '*The Firemen's Insurance Company have insured on it for us.*' Now this insurance, it is admitted, was in the name of J. L. Gray & Bro., which shows that Mr. Crane regarded an insurance in that form, in that company, as an insurance for them. Why then would not an insurance, in *that form,* in the National Insurance Company be of *equal avail for them?* Their witness, Jas. L. Gray, was very emphatic in stating to Mr. Seidenstricker, '*that Jas. L. Gray & Bro. had an insurance in the Firemen's Insurance Company.*' This was stated at the time Mr. Seidenstricker took the memorandum of insurance from Mr. Crane, and Mr. Crane, himself, says that at that time, 'he repeatedly stated to Mr. Seidenstricker *all pertaining to previous insurance in the Firemen's Insurance Company.*' Why should this have been stated at all if it had been designed and understood that this was to be a *different interest* and in *a different name from that in this other company?* This being my view of this testimony of the complainant on this point, assuming that there is no objection to the competency of Mr. Crane, as a witness for him, I am forced to the conviction that the evidence offered by him to prove mistake and error in this policy is insufficient for that purpose. The words, *'for the benefit of W. Crane & Co.,'* subjoined by Mr. Crane to the application for insurance, in my opinion, furnish no proof that it was asked upon

his supposed insurable interest in the premises.    On the con trary, taken in connection with all the other circumstances of the case, and statements of the parties, it would tend to show that it was intended to be such an insurance as had been effected in the Firemen's Insurance Company, and that the alteration, by Mr. Seidenstricker, of these terms did not in any degree impair the insurance, as one for the benefit of W. Crane & Co., but secured the certain payment of the loss, if any, to them.

"Was there then *at the time* of the *renewal of this policy* any *mistake made* in the *manner* in which it was done, that has been sufficiently proved to enable this court to correct it, and reform the contract?

"The only evidence in the record, offered by the complainant in regard to the renewal, is the testimony of Mr. Crane, and his entire statement is comprised in this extract: 'Witness went to the National Fire Insurance Company and asked Mr. Seidenstricker, whether they would *renew* the policy for six months, &c.   Witness then proceeded to state to Mr. Seidenstricker and two of the directors, that W. Crane & Son had the assignment from Jas. L. Gray & Brother, and that *next month* said *Crane & Son were to make* the *last payment* of the *purchase money*, and *would then have a deed of the property*.' The question was then started by Mr. Bartlett, whether Crane & Son were insured or not? whether there was any insurance at all?   Mr. Bartlett took the assignment and said: "Oh, this is not a deed—it is only an assignment—*it will be necessary for you to have the policy transferred when you make the last payment, and get the deed*,' and Mr. Fenby then took the policy and showed witness *how the transfer was to be made*.   Witness then left the office, but soon returned and said: 'Mr. Seidenstricker, we have concluded to insure not over $2000, as all the sumac is sold, and that is all we feel like we could honestly claim from the company.'   Mr. Seidenstricker's reply was, 'I am glad of it,' and witness then paid Mr. Seidenstricker the money—$40—and the endorsement for twelve months was made on the policy, which witness took away with him.'

This witness stated further, 'that the company was informed of all the titles which the firm of witness had to the property at the time of the renewal of the policy.'

"According to this statement of Mr. Crane, the application at that time made by him was for a *renewal of the original policy*, and by the endorsement then made upon it, it was doubtless intended and understood that the insurance effected by the policy, reduced to the amount of $2000, was continued for one year. And assuming, as Mr. Crane states, that the assignment by the Grays of their interest- in the premises to W. Crane & Co. was exhibited to, and examined by, the president of the company, and the two directors who were present, they did not regard this circumstance as requiring any more to be done at that time, to give to W. Crane & Co. the security from the insurance that they desired, but to endorse upon the policy the renewal of the insurance in the manner in which it was done. But it is manifest, and the statement of Mr. Crane proves, that the officers of the company, were of opinion and so stated to him distinctly, that it would be indispensable for the security of of W. Crane & Co., and to give them the benefit of the insurance, that they should have *the policy assigned to them when they made the last payment and got the deed*. So that this memorandum of renewal was intended and understood, at the time, to have the effect of securing and protecting the interest of W. Crane & Co., and continuing the insurance only until they made this payment and took the deed. They were fully apprized that so soon as this should be done, it would be necessary to have the policy transferred to them, and they perfectly understood that this would be required of them. It was not intended then that the renewal of the policy in this mode, should give W. Crane & Co. any claim against the company after they obtained the deed for the property, unless they should have the policy transferred to them; and if this court should give it any force and effect beyond their intent, by reforming or changing it, it would, by doing so, make a contract for the parties different from that which they themselves intended.

"In the view at the time taken by the company of the title and interest of W. Crane & Co. in the property, it did not deem it necessary for them to have the policy transferred to them, then, or for them to take out a new policy in their name. If they were in error in this opinion, they committed a mistake of law, which perhaps they would not have been allowed to plead against their liability to W. Crane & Co., in case a loss had occurred before the time when they were to make the last payment and take a deed, and procure a transfer of the policy. But, in my opinion, this court can now do nothing in the way of correcting any supposed mistake made by the parties in the contract then intended to be made, or of reforming the agreement then entered into, if for no other reason, because the state and condition of things in reference to which the transaction took place no longer exists, the parties having since made this payment and taken a deed of the property. In fact the difficulty with which the complainant has to contend, is not that a mistake was made at the time the policy was renewed, but that when the state of things occurred which rendered it necessary for him to get a transfer of the policy, he failed to do so, and so failing also neglected to take out a policy in the name of W. Crane & Co. There is a remark of Mr. Seidenstricker's, introduced by Mr. Crane, the witness, made at the time he called upon Mr. Seidenstricker to inquire as to the effect Mr. Thompson's insurance in the Etna might have upon this policy, which remark, Mr. Crane said, quieted his apprehensions. The witness states the conversation that took place at that time, in connection with this remark of Mr. Seidenstricker in such a manner as to create the impression that Mr. Seidenstricker quieted his apprehensions in regard to the necessity of procuring a transfer of the policy, but it is difficult to bring the mind to believe that this was either what Mr. Seidenstricker intended by the remark, or what Mr. Crane understood it to mean, because it was stated to him so distinctly at the interview between Mr. Seidenstricker and the two directors who were present when he applied for the renewal of the policy, that the transfer would be necessary, and, because, after this

remark and when he was about taking the deed, he manifested so much solicitude in regard to the transfer of the policy by Gray, making application to him for that purpose through his counsel, and also through Mr. Stabler.

"I am of opinion, then, that this court cannot afford relief to the complainant upon the ground that there was mistake in the original policy, or in the renewal of it, and I am also of opinion that there is no sufficient evidence in the record of any acts or conduct of this company, or of its agents, that relieved W. Crane & Co. from the necessity of procuring a transfer of this policy of insurance to them, *if such transfer was necessary* to give them the benefit of the insurance, in consequence of the assignment of Jas. L. Gray & Bro., of all their interest in the property *to the said W. Crane & Co.*

"But the complainant insists, that though W. Crane & Co. failed to procure a transfer of the policy, they might have obtained the security they desired by an insurance, by taking out a policy in their own name, after the property was conveyed to them by the Stablers, which they were ready and willing to do, and would have done, had not the secretary of the company instructed and advised them that, under the circumstances, it was unnecessary, and that, if a loss occurred, they would be entitled to the amount insured upon this policy. There is, therefore, still left for consideration the following questions:

"1st. Was the other insurance, which the Grays had on these premises, notified to the company before or at the time of executing this policy?

"2nd. Will the fact that the prior insurance made on this property in the Firemen's Insurance Company, though notified to the defendant, was not caused to be endorsed on this policy, enable the defendant to protect itself from liability thereon?

"3rd. Was it necessary for W. Crane & Co. to procure from Jas. L. Gray & Bro., when they assigned their interest in the property to W. Crane & Co., a transfer of the policy assented to by the company, *the loss insured against by the same being made payable to them*?

National Fire Ins. Co. *vs.* Crane.

"4th. Did W. Crane & Co. make an offer, at any time, to take an insurance on the property in their own name, and were the acts, conduct and statements of the agent of the company, at the time when such offer was made, of such a character as to render the company liable to W. Crane & Co. for the amount insured, in the same manner as if the insurance had been taken in their name?

"To dispose, in the first place, of the fourth question:— Assuming that Crane & Co. did offer to the insurance company to take a policy in their own name:—They insist, that having made such offer, and having been informed, as they allege, by the secretary of the company that it was not necessary to take out a policy in their name, because the policy, which had been issued to the Grays, contained the words, '*loss, if any, payable to W. Crane & Co.*,' and having, in consequence of that information, omitted to take the policy in their name, the company is responsible to them, in the same manner as if they had so taken out a policy. Now, the evidence in regard to what the secretary stated upon this subject, is very contradictory, and, if I deemed it necessary to determine what he did state, I should find it exceedingly difficult to do so, in the conflict of testimony on the point. But I am relieved from this perplexing task, because I have become convinced that the secretary had no power to bind the company, by expressing the opinion which, it is alleged, he did in regard to the force and effect of the phrase above quoted. It was a legal opinion, and there is nothing in the record to show that he was the agent of the company to create obligations for it by declaring the meaning and import of the terms used in its policies. The company, acting through its directors, might have bound itself by its acknowledged interpretation of such terms, but it would require clear proof of special authority, for that purpose, conferred upon an agent, to satisfy a court that it should give effect to his opinions and judgments, and there is no proof that this secretary had any such authority given to him, or that his agency for the company was of such a character that this power might reasonably be regarded as incident to it.

"In regard to the question, whether the other insurance that the Grays had on this property, was notified to the company before or at the time of executing this policy:—From a careful examination of the testimony, I am of opinion that the weight of the evidence is decidedly in favor of the position that the insurance in the office of the Firemen's Insurance Company was notified to the National Fire Insurance Company before it executed the policy upon which this claim is made. Mr. Seidenstricker, upon his cross-examination, says, that 'a little previous to the insurance, he went to the mill, to examine it before insurance; he has a floating idea of some conversation there of an existing insurance.' Mr. Gray and Mr. A. Fuller Crane, both, swear, positively and distinctly, that this previous insurance was expressly notified to the company. I regard them both as competent witnesses, whatever interest either may have had in this controversy having been extinguished by releases. It is true, the testimony of Gray is specially excepted to, because the release given to him was not executed and delivered until after his examination had been taken. But I find it clearly settled that a witness, interested at the time of his examination, may be released and re-examined. 3 Phillips' Ev., (Cowen & Hill's Notes,) 161. 2 Vern., 472, Callow vs. Mince. 7 Wend., 180, Tallman vs. Dutcher. 5 Littell, 203, Haddix vs. Haddix. 5 Wend., 58, Ten Eyck vs. Bill. The re-examination of a witness under a commission from chancery, in this State, does not require any order of court. Alex. Ch. Prac., 72. And though this witness was not formally re-examined by repeating to him all the interrogatories and cross-interrogatories, that he had answered before the release was made to him, yet the mode in which he was re-examined may be deemed equivalent thereto.

"But if the fact be that the notice of the other insurance was given by the assured, to the company, before this policy was executed, still it is objected that he did not cause the same to be endorsed thereon. The endorsement of the notice was to be the act of the insurance company, and is designed for its especial benefit. The reasons assigned for re-

quiring notices of this description are, that the insurers may know the amount of the applicant's interest in the property to be insured, uncovered by insurance, and thus have the means of judging whether the amount uncovered will be sufficient to make it the interest of the insured to employ vigilance, care and strenuous exertions to preserve it. If the party called upon to make the insurance is of opinion that too much of the value of the property is covered, he declines taking the risk, or continuing it, if it has already been insured. The contract of insurance being a mere contract of indemnity against actual damage, and the different insurers of the same property being entitled to compel contribution from each other in the event of a loss, another reason for the notice is, that it informs the insurer in regard to the parties to whom he may resort for contribution, if the circumstances of the case should require it. The purpose of the endorsement of the notice is to preserve distinct and accurate evidence as to the parties who may be called upon to contribute, and perhaps in the case of a second insurance, to signify the former insurer's consent to continue the risk. Where the notice is given to a party, who has not already taken a risk, the necessity for the endorsement on the policy to signify his consent to accept the risk, cannot be reasonably urged, inasmuch as this is proved by his executing and delivering the policy, if he should do so after the notice of other insurance. Now all these reasons look to the benefit and advantage of the insurer. It is his interest to make the endorsement on the policy after he is informed of the former insurance. And, in my opinion, it is not only his interest, but it is his duty to do so. *The insured can do no more than give the notice.* Is it equitable then, that a party who through inadvertence, or other cause has omitted to do any act which would show that another had complied with a condition, should take advantage of his omission, and thus discharge himself from all liability under his contract? There can be no doubt that it has repeatedly been decided, that *at law*, a plaintiff cannot recover upon a policy of insurance with this clause, unless he produce the policy with the notice endorsed upon it. But whilst

this has been decided in cases in which the assured has made *his claim in a court of law*, the courts in their opinions in these cases have gone no further than to say that, *at law*, the plaintiff cannot recover without proof of the notice and the endorsement, and have actually suggested the question whether his claim might not be enforced in a court of equity upon proof of notice only. 7 *Cush.*, 179, 181, *Barrett, et al.*, *vs. Union Mutual Ins. Co.* From the report of the case of *Carpenter vs. The Providence & Washington Ins. Co.*, 16 *Pet.*, 512, it appears that the court below had been asked to instruct the jury, "that if the insurance company had notice in fact of the existence of the other policy, that was in law a compliance with the terms of the policy.' The court refused to give the instruction as prayed, but instructed the jury that *at law, whatever might be the case in equity*, mere parol notice of such insurance was not of itself sufficient to comply with the requirements of the policy declared on. The Supreme Court says: 'We think this instruction was perfectly correct.' The plaintiff, in the above case, having failed at law, filed his bill on the equity side of the Circuit court of the United States, for the district of Rhode Island, to compel the insurance company to endorse the notice on the policy and to pay the amount insured. At the hearing of the case his bill was dismissed, the decision of the court turning upon the sufficiency of the proof of the fact that notice was given to the company. The case, upon an appeal taken from this decision, is reported in 4 *Howard*, 185. The Supreme Court of the United States concurring in the opinion expressed by the Circuit court, that the proof of notice was insufficient, dismissed the case upon that ground alone, without, however, in the slightest degree, casting the weight of its authority against the position of law assumed by the complainant, that equity would afford relief upon sufficient proof of the fact of notice.

"But assuming that the endorsement of this notice upon the policy was a condition precedent to the complainant's right of action upon it, I am of opinion that upon the principles that regulate courts of equity in granting relief to parties fail-

ing to comply with such conditions, the plaintiff is entitled
to relief. The Court of Appeals, in the case of the *City
Bank vs. Smith*, 3 *G. & J.*, 281, says: 'It has been
urged that this being the case of a condition, equity will re-
lieve against the effects of the non-performance of it, &c.
Equity will relieve against penalties and forfeitures, and
where the matter lies in compensation, whether the *condi-
tion be subsequent or precedent.*' In *Chipman vs. Thompson,
Walk. Ch. Rep.*, 411, the court, quoting from 2 *Cruise Dig.*,
40, says: 'The substantial difference which governs courts
of equity, in cases of conditions, is not whether the condition
be precedent or subsequent, but whether a compensation can
or cannot be made.' The court adds: 'The party asking re-
lief may have so conducted himself as to have lost all claim to
the interposition of the court. He may have absolutely re-
fused to perform the contract, or he may have renounced all
rights under it. But when this is not the case, and it is
equitable under the circumstances that relief should be given,
it is competent for the court to give it.' The case under con-
sideration is a strong one for relief under this rule, because
no damage has accrued to the defendant in consequence of
the absence of the endorsement of notice on the policy, but
it is, in fact, so far as the purposes designed by the notice
and endorsement are concerned, precisely in the condition in
which it would have been if it had been actually made.
But, being of opinion that it was the duty of the company,
after it received notice of this prior insurance, to endorse it
on the policy before delivering it to the insured, (12 *Eng.
Law & Eq. Rep.*, 180,) the complainant is entitled to
relief under another well settled rule, that equity will re-
lieve where the performance of the condition has been
prevented by the fraud or default of the adverse party. 3
*Gill*, 269, *Cross vs. Cohen.*

"In regard to the points involved in the third of the above
questions, viz: that the plaintiff is not entitled to relief, be-
cause the policy was not assigned to him with the consent of
the company:—It is to be observed that, by this policy, the
loss, if any, was made payable to W. Crane & Co. They

being the parties actually named in the policy, to whom the loss was to be paid, there was no necessity for an assignment to them, to entitle them to recover upon it, unless the circumstance that the Grays had assigned their interest in the property insured to W. Crane & Co., rendered it necessary. An assignment of the policy is, of course, indispensable in the case where a party has insured property and, subsequently, transfers all his interest in it to *another*, having no previous connection with the transaction. The party insured can not recover on the policy, for the reason that he has parted with all his interest in the property; nor can the party to whom the transfer has been made, because he does not hold the policy duly assigned to him. He can claim no rights under it, except *by virtue of an assignment to him, to which* the insurer has given his assent. This assent is deemed necessary, because the contract for insurance against fire is founded very much on personal confidence. The insurer knowing the party for whom he made the insurance, and having confidence in him as a man of integrity, was willing to contract with him, but may be altogether unwilling to continue the risk in favor of the party to whom the policy may be assigned, and, therefore, it is usual for the insurer to reserve, in the terms of insurance, the privilege of objecting to the assignment of the contract. The cases to which the objection applies—that the assignee of the property insured has failed to obtain an assignment of the policy assented to by the insurer—are those in which the property insured has been transferred to some other than the *party named in the policy*, as the one for whose benefit the insurance was made, or the one to whom the loss, if any, is to be paid. But in this case, the interest in the property insured has been transferred to the very persons to whom the loss, if any, is to be paid. They required no assignment of the property to enable them to bring suit upon it, because they are the parties to whom the insurer has agreed to pay the loss, and who are entitled to demand it at law, if payment be refused. Nor did they require it for the purpose of presenting it to the insurer, so as to obtain his assent to the continuing of the risk

in their behalf, because the property had been originally insured for their benefit, by naming them in the policy as the parties entitled to the loss. This case is peculiar in its circumstances. The loss, if any, having been made payable, by the terms of the policy, '*to W. Crane & Co.*,' it may be regarded as having been, at its inception, assigned to them with the assent of the company, and the circumstance that the property insured has been subsequently transferred to them, cannot, as it appears to me, enable the company successfully to resist their claim to the loss. None of the reasons upon which the rule requiring an assignment of the policy, and the assent of the insurer thereto, apply to this case.

"The decisions referred to, and those to be found in the books, in regard to the kind of *assignment of the interest insured that vacates a policy*, unless it is notified to the insurer and assented to by him, do not properly apply to this case, because the policy does not contain any clause declaring it void in case of an assignment of the property insured, without notice to the company and its assent thereto. It only provides as follows: 'Nor can *any policy, or interest therein, be assigned*, but by consent of the company, expressed by endorsement made thereon.' This policy was not assigned to W. Crane & Co. They did not require any assignment of it to them to entitle them to demand the amount insured. By the terms of the policy it was made payable to them by name, and no good reason, in my opinion, can be urged to show that the assignment of the interest insured to the parties named in the policy, for whose benefit the insurance was made, and to whom the loss, in case it was destroyed by fire, was to be paid, should impair their right to recover the insurance. Entertaining these views, I am of opinion that the complainant is entitled to the relief that he asks in his bill, and must decree accordingly."

A decree was then passed, directing the defendant, the insurance company, to pay the complainant the sum of $2350, being the amount of the policy, with interest from the filing of the bill, and dismissing the bill as to Gray, the other defendant. From this decree the insurance company appealed.

The cause was argued before LE GRAND, C. J., ECCLES-TON, TUCK and BARTOL, J.

*Wm. Schley,* for the appellant:

1st. James L. Gray, at the time he was examined, was clearly not a competent witness for the appellee. If the release to him restored his competency, he should have been examined again, and not simply asked to read over what he had previously testified to, and say whether he adopts it or not.

2nd. Andrew F. Crane was not a competent witness for the appellee. His assignment of his interest in the policy was not made *bona fide,* but in hatred and in spite, and with a bad intent, and the avowed purpose of enabling him to become a witness. 4 *Gill,* 213, *Crawford vs. Brooke.*

3rd. Seidenstricker and Magruder were competent witnesses for the appellant. Neither of them was a stockholder in the company, and the company cannot by possibility have a suit, or recovery, over against either of them on account of losing this case, because the claim here is not founded on neglect, but on contract, and the action is not in *tort* but *ex contractû.*

4th. The policy never attached because of the prior subsisting insurance in the Firemen's office. *5 Md. Rep.,* 165, *Associated Firemen's Ins. Co. vs. Assum.* The *assured* were bound to see that the endorsement was duly made, of this prior insurance. Gray and Crane both knew the fact. Seidenstricker and Magruder say they did not know of the prior insurance. 16 *Pet.,* 495, 511, *Carpenter vs. Prov. & Wash. Ins. Co.*

5th. If the policy ever attached the *cesser* of the interest of the assured, J. L. Gray & Brother, before the occurrence of the fire, debars any claim. It was a contract of indemnity and the assured sustained no loss if there was no continuing interest. The deed of the 3rd of October 1854, made by the Grays to Wm. Crane & Co., is clear and unambiguous and cannot be contradicted by any of the parties thereto. 6 *Md. Rep.,* 52, *Alderson vs. Day.*

6th. The policy was clearly not assignable without the consent of the company. If Wm. Crane & Co., or Wm. Crane & Son, were the assured, in fact, and the policy was reformed, the right would be not in the appellee alone, but in the appellee and Andrew F. Crane.

7th. As it is clear, then, that the appellee could not recover at law, the question arises whether this bill can be sustained? and it is equally clear that equity has no jurisdiction unless on the ground of *mistake, surprise,* or *fraud.* There is no evidence of mistake—none of surprise—none of fraud. The utmost that can be said is, that the parties had an *object* in view which the instrument failed to accomplish. But there is no proof that the instrument was intended to be other than, or different from, what it actually is. 1 *Pet.,* 1, *Hunt vs. Rousmaniere.* 2 *Md. Rep.,* 25, *McElderry vs. Shipley.* 6 *Md. Rep.,* 479, *Showman vs. Miller.* 4 *Md. Ch. Dec.,* 335, *Wood vs. Patterson.* 9 *Md. Rep.,* 356, *Wilson vs. Watts.*

8th. But the proof of the alleged mistake in the policy is by no means sufficient. The rule is well established that the proof must be conclusive of the *identical* agreement alleged, and the agreement must be alleged with *certainty.* 1 *Md. Ch. Dec.,* 239, *Goldsborough vs. Ringgold.* 2 *Md. Ch. Dec.,* 151, *Hall vs. Clagett.* 6 *H. & J.,* 445, *Watkins vs. Stockett.* 9 *Gill,* 430, *Beard vs. Hubble.* 6 *Md. Rep.,* 479, *Showman vs. Miller.* 2 *Johns. Ch. Rep.,* 274, *Getman's exc'rs vs. Beardsley. Ibid.,* 557, *King vs. Baldwin. Ibid.,* 585, *Gillespie vs. Moon. Ibid.,* 630, *Lyman vs. The United Ins. Co.*

*R. S. Matthews* and *S. T. Wallis,* for the appellee.

1st. The evidence of Andrew F. Crane was properly admissible. It matters not even if he assigned his interest for the purpose of becoming a witness. 7 *Md. Rep.,* 603, *Pegg vs. Warford.* 4 *Gill,* 213, *Crawford vs. Brooke.* 4 *Barn. & Adol.,* 760, *Wilson vs. Hirst.* 3 *Phillips' Ev.,* 126, (*u.*)

2nd. The evidence of Jas. L. Gray was admissible, he having been called on to reiterate his testimony, after the release

was executed, which made him competent. 1 *Greenlf. on Ev.*, sec. 426, and cases there referred to. 5 *Carr. & Payne*, 454, *Wake vs. Lock*. 1 *Phillips' Ev.*, 103, 104. 3 *Phillips' Ev.*, 119, 123, *note* 663.

3rd. That both Magruder and Seidenstricker were incompetent witnesses for the company, being both liable over in case the company should be made responsible, through their default or misconduct, for loss not apparently covered by the policy. 1 *Greenlf, on Ev.*, secs. 393, 394. 3 *Phillips' Ev.*, 59, 68.

4th. The assignment of his interest in the policy by A. F. Crane to the appellee was *bona fide* made, and under the decision in *Crawford vs. Brooke*, 4 *Gill*, 213, the latter could sue thereon at law, but in equity the assignee has a right to sue, *if he be assignee*. Where the assignment is made, as in this case, *after the loss*, and for the sole purpose of enabling the assignee to recover the loss, it is nothing more than the assignment of a debt, and does not come within the restrictive condition of the policy, forbidding it, or any interest therein, to be assigned, except by consent of the company, expressed by endorsement made thereon. 25 *Barb.*, 193, 194, *Goit vs. National Protection Ins. Co.* 17 *New York Rep.*, 615, *Mellen vs. Hamilton Fire Ins. Co.* See, also, 7 *Barb.*, 570, *Tillou vs. Kingston Mutual Ins. Co.*; 3 *Md. Rep.*, 353, *New York Life Ins. Co. vs. Flack*, and 16 *Barb.*, 511, *Wilson vs. Genesee Mutual Ins. Co.*

5th. Nor was it necessary, after the Grays had assigned their interest in the property to the Cranes, for the latter to have procured from the former a transfer of the policy assented to by the company and endorsed thereon, even if the Grays be considered the parties insured, and intended so to be when the policy was issued and renewed. The fact that the loss, if any, was made payable to Wm. Crane & Co., was an assignment of the policy, at its inception, to them, with the assent of the company, and nothing more was required to enable them to recover upon it. 5 *Rhode Island*, 394, *Brown vs. Roger Williams Ins. Co.*

6th. At the time the policy was executed, the company,

through its proper officers, was fully notified, not only by the written terms of the original application, but by parol notification, of the most express character, that the insurance was intended to cover the interest of the Cranes in the premises, and for their benefit altogether, and that the premises were under a previous insurance. It was left to the company to prepare the policy in view of this state of facts, and to meet and cover the wishes of the Cranes, and the distinct understanding of the parties. The policy was accordingly prepared either in good faith, and for the purpose of protecting the Cranes, or in bad faith, and for the purpose of defrauding them. In either case, it was the work of the company and its officers, and any defect by which it fell short of answering the purposes contemplated, as above stated, was the result of either mistake or fraud on the part of the company, and should have been reformed had the loss occurred before the policy expired. Again, on the 3d of October 1854, the Grays executed to the Cranes an assignment of their interest in the property and premises, which was but an equitable interest under a bond of conveyance from the Stablers. Before and at the time when the policy was renewed, on the 13th of January 1855, the company had full notice that the agreement to assign, for security, had thus been carried out, and the insurance was renewed with the most explicit understanding in regard to this mutation of title on the record, as well as to the existing insurance in the Firemen's office. The testimony of A. F. Crane is ample and conclusive on this point; and it would be to justify and encourage an intolerable fraud to permit the company to escape from responsibility upon the score of any defect in the language of the endorsement on the policy or any failure to note thereon the pre-existing insurance. The whole facts were fully communicated to the company's officers. The preparation of the proper form of obligation was entrusted wholly to their good faith and discretion, and the form they adopted was, in good faith, accepted, and, it is submitted that, a court of equity should either enforce the policy and endorsement as they stand, or so reform both as to make the company responsible thereunder.

12 *Eng. Law & Eq. Rep.*, 171, *Collett vs. Morrison.* 27 *Eng. Law & Eq. Rep.*, 144, 145, *Wing vs. Harvey.* 11 *Barb.*, 624, *Masters vs. Madison County Mutual Ins. Co.* 4 *Cowen*, 663, *Perkins vs. Washington Ins. Co.* 16 *Barb.*, 511, *Wilson vs. Genesee Mutual Ins. Co.* 19 *Barb.*, 440, *Viall vs. Genesee Mutual Ins. Co.* 14 *New York Rep.*, 262, 263, *Ames vs. New York Union Ins. Co.* 18 *Barb.*, 541, *Buckbee vs. United States Ins. Co.* 1 *Comstock*, 291, *Conover vs. Mutual Ins. Co. of Albany.* 7 *Foster*, 165, 166, *Marshall vs. Columbian Mutual Fire Ins. Co.* 19 *Penn. State Rep.*, 45, *Perry County Ins. Co. vs. Stewart.* 23 *Penn. State Rep.*, 50, *Howard Fire Ins. Co. vs. Bruner.* 22 *Conn.*, 575, *Peck, et al., vs. New London Mutual Ins. Co.* 26 *Penn. State Rep.*, 199, *Ins. Co. vs. Slockbower.* 17 *Ohio*, 192, *Neville vs. Merchants, &c., Mutual Ins. Co.* 19 *How.*, 318, *Commercial Mutual Marine Ins. Co. vs. Union Mutual Ins. Co.* · 7 *Barb.*, 570, *Tillou vs. Kingston Mutual Ins. Co.* 12 *La. Ann. Rep.*, 486, *Duncan vs. Sun Mutual Ins. Co.* 16 *B. Munroe*, 258, 259, *Etna Ins. Co. vs. Jackson & Co.* 2 *Amer. Lead. Cases*, 617, 621; 625, 628.

Tuck, J., delivered the opinion of this court.

The policy, in this case, insured James L. Gray & Bro. against damage by fire to property in the city of Baltimore, "the loss, if any, payable to Wm. Crane & Co." The present appellee—the complainant below—claims relief as assignee of his partner's interest in the policy, on the ground that it should have been issued in the name of Wm. Crane & Co., as the assured, and also that the renewal should have been made in their name, or that of Wm. Crane & Son; the allegation being, that the company committed a mistake in these respects, which errors the complainant insists it is competent for a court of equity to correct, and to grant relief accordingly.

An examination of the record has satisfied this court that the complainant is not entitled to relief on the supposition that such mistakes were committed. We think that the policy was issued and accepted, and that it was renewed, as the

parties concerned designed it should be; Wm. Crane & Co., being regarded by the Grays, as well as the company, as the persons beneficially interested in the property, and entitled to compensation in case of loss. Without reviewing the evidence, we may say that the learned judge below has demonstrated this very clearly in his opinion.

The question then arises, whether Wm. Crane & Co. were under any obligation to have obtained for the Grays a transfer of the policy, assented to by the company, as in ordinary cases. On this point we are of opinion with the court below, that they were entitled to the benefit of the insurance without such transfer. Courts of justice must regard all the parts of a transaction, and impute to parties a motive for doing or saying what the case discloses. Every fact and declaration must be considered as the result of design, or agreement, and the intent of the parties should have effect, if it can be done consistently with established rules. *Eaton vs. Jaques*, 2 *Doug.*, 460; *Calvert vs. Bradley*, 16 *Howard*, 593. Tested by this principle, what are we to suppose the company meant by issuing this policy, with the endorsement, that the loss, if any, should be paid to Wm. Crane & Co.? It was an admission by it, that they had an interest in the contract, and were to receive the benefit of it. As observed by the judge below, the policy may be regarded as having been at its inception assigned to them with the assent of the company," which doctrine was announced in the case of *Brown vs. The Roger Williams Ins. Co.*, 5 *Rhode Island*, (2 *Ames*,) 394. An insurance was effected on property that was then mortgaged to the plaintiff in the suit—the policy having been issued to the mortgagors, "the loss, if any, payable to the plaintiff." To an action by the mortgagee the company pleaded that it, and the mortgagors, had referred to arbitrators the matter of the loss in question, that an award had been made, and this was relied on in bar of the suit. On demurrer to this plea, it was held that the clause making the loss payable to the plaintiff, was, "in legal effect, an assignment of the policy, concurred in by the company, to the plaintiff as mortgagee, by virtue of which he alone was en-

titled to receive the amount of the loss, as additional collateral security for his debt," and that "his interest in the policy required his assent to the adjustment of the loss, in order to make it binding upon him." Concurring with the court below, as to this part of the case also, we think the complainant may maintain his suit, unless it can be defeated by the defences relied on by the company.

We have no doubt of the competency of James L. Gray, and of A. F. Crane, to testify for the complainant. All their interest in the subject-matter was parted with. It makes no difference that Gray was examined a second time, after his release. "A release to qualify a witness must be given before the testimony is closed, or it comes too late. But if the trial is not over the court will permit the witness to be re-examined, after he is released, and it will generally be sufficient to ask him if his testimony, already given, is true, the circumstances under which it has been given, going only to the credibility." 1 *Greenlf. Ev.*, 426. *Wake vs. Lock,* 5 *C. & P.*, 454, (24 *Eng. C. L. Rep.*, 402.) 7 *Wend.*, 180, *Tallman vs. Dutcher.*

Nor does the fact that A. F. Crane transferred his interest for the purpose of becoming a witness disqualify him, however it may affect his credit. It is no uncommon thing, at law as well as in equity, for persons to execute or receive releases with such motive. Even where the interest is disclosed during the trial, the examination will be suspended in order that the disqualification may be removed. The case of *Crawford vs. Brooke,* 4 *Gill,* 213, has no application. There the question arose under an Act of Assembly, and related, not to the witness' competency, but to the *bona fides* of the plaintiff's assignment, without which he had no right to sue in his own name. *Pegg vs. Warford,* 7 *Md. Rep.*, 582. *Reynolds vs. Manning,* 15 *Md. Rep.*, 510.

We also think that Seidenstricker and Magruder were competent. The record does not disclose such an interest in either of them, as, under the authorities cited by the appellee, created a disqualification as witnesses for the defendant.

The last points necessary to be noticed are, whether the

prior insurance was notified to the defendant, and if so, whether its not having been endorsed on the policy, affects the present suit? We conclude, from all the proof on this question of fact, that the president of the company was notified of the previous insurance. It is positively stated by the complainant's witnesses, and Mr. Seidenstricker admits a conversation about an existing insurance. It is more reasonable to suppose that his memory is at fault, on account of the number of applications made to him, than that the other witnesses, having had a particular agency in this case, should fail to recollect so important a circumstance. The omission, probably, was caused by the failure of the president, at the time, to direct his clerk to make the endorsement, or by the neglect of the clerk, by whom it appears the policy was prepared and delivered to the assured.

Whatever effect the want of such an endorsement may have at law, in an action on the policy, we think it cannot be urged in a court of equity, in a cause otherwise free from objection. The judge below has correctly stated the law on the subject. The endorsement could have been made only by the company. If it be omitted, who is to blame? Certainly not the assured. These policies contain many stipulations—some of them operating as conditions precedent—for the benefit of the company, and few for that of the assured. It is too common for application to be met, and adjustment refused, on frivolous and unjust pretences, in order to defeat fair claims, on contracts of which good faith is the very essence, and we think it would promote the interest of insurance companies, and tend to a higher state of morals in business transactions, if they would exhibit more readiness to settle demands upon them, than, as we discover from the numerous reported cases on the subject, appears to be usual with them. In this case the president of the company dictated the application himself; the prior insurance was made known to him; the parties relied upon him; they never went to the office of the company, he came to the counting-house of the complainant, seeking the risk, and after hearing all they had to say on the subject, he de-

parted, and soon after sent the policy, and received the premium, his clerk saying that it was all right; the only defect, however, being that the company had omitted part of its own duty in not endorsing the former insurance. In such a case we are called upon to say that the party is without remedy; on the contrary, we think it would be a reproach to the jurisprudence of the State, if this company were discharged from their contract on any such ground. There is a distinction in cases where the preparation of an instrument belongs to the party to become liable under it; he ought to be dealt with more strictly. 19 *Ves.*, 257. Insurance contracts are within this principle, and equity will interpose not only in cases of fraud, but also of mistake, where a policy is drawn up in a form different from the application, or any thing is omitted which it is the duty of the company to insert, or endorse on the instrument. *Collett vs. Morrison*, 12 *Eng. Law & Eq. Rep.*, 171.

Finding no objection to the decree below, it will be affirmed with costs.

*Judgment affirmed.*

(Decided June 28th, 1860.)